Sharon NASTROM, Plaintiff
and Appellant,

v.

Ned NASTROM, Defendant
and Appellee.

Civ. No. 9375–A.

Supreme Court of North Dakota.

Sept. 26, 1979.

Rehearing Denied Oct. 25, 1979.

Chapman & Chapman, Bismarck, for plaintiff and appellant; argued by Daniel J. Chapman, Bismarck.

Lundberg, Conmy, Nodland, Rosenberg, Lucas & Schulz, Bismarck, for defendant and appellee; argued by Patrick A. Conmy, Bismarck.

ERICKSTAD, Chief Justice.

The plaintiff, Sharon Nastrom, appeals from a judgment of divorce granted on the grounds of irreconcilable differences. Her basic contention is that the court inequitably divided the marital estate. We affirm.

This action was originally commenced against the defendant, Ned Nastrom, by service of a summons and complaint dated March 30, 1976. The case was tried in Burleigh County District Court on Decem- ber 21, 1976. A memorandum opinion was issued by the district court on January 18, 1977. The findings of fact, conclusions of law, and order for judgment were executed on March 1, 1977, and Sharon appealed from that judgment to this court [262 N.W.2d 487 (N.D.1978)]. This court reversed the division of property ordered by the district court [1] and remanded the case for a new trial on the issue of property distribution, and, if necessary, on the reallocation of alimony.

A second trial was held in Burleigh County District Court commencing July 6, 1978. On October 30, 1978, the court issued its findings of fact, conclusions of law, and order for judgment, reverting back to the original property division with the exception of one additional item that was added to the property given to Sharon, that being a duplex with a net equity value of approximately $15,173. The district court also ordered that Ned pay an additional $1,000 for Sharon's attorney's fees, this being in addition to the $1,000 previously awarded at the first trial. Judgment was executed on November 10, 1978, and on November 24, 1978, Sharon made a motion for amendment of the findings, but this motion was subsequently denied.

On December 19, 1978, Sharon filed a notice of appeal, and, subsequent thereto, Ned made a motion to dismiss the appeal pursuant to Rule 27 of the North Dakota Rules of Civil Procedure. Sharon also made a motion for payment of transcript fees, as she was unable to pay the court reporter the $1,500 required in order to secure a transcript of the trial. The motion to dismiss the appeal was denied by this court,

---

1. The district court determined that the net worth of the parties was approximately one hundred sixty thousand dollars ($160,000). The Supreme Court, on review, found that this amount was evidenced in only one place, an unaudited statement of Ned's assets and liabilities compiled by the Minnesota accounting firm of Anderson & Seiberlich, certified public accountants, and therefore the finding was clearly erroneous because the following assets of the Nastroms were nowhere mentioned:

   1. Mobile home located near Tappen, North Dakota;

2. Ninety shares of stock in Nastrom-Peterson Motors, valued at from $262 per share to $388 per share;
3. Twelve and one-half percent interest in Dick Fisher Motors of Glasgow, Montana;
4. Twenty-five percent interest in Dan Porter Motors of Dickinson, North Dakota;
5. A partnership interest in Northern Properties, holder of an undeveloped business lot in Williston, North Dakota; and
6. Twenty-two and one-half percent interest in Triple A Corporation, a leasing enterprise.

and the motion for payment of the transcript fee was granted. [276 N.W.2d 130 (N.D.1979)]

The parties were married in International Falls, Minnesota, on April 16, 1954. Both were very young and neither brought any property into the marriage. However, since 1954, the financial condition of the parties has changed dramatically, and to date, the Nastroms have attained considerable wealth.

On appeal, Sharon has raised several issues which will be dealt with throughout the course of this opinion. The primary issue, however, concerns the district court's division of the couple's property, and whether or not the division was clearly erroneous under Rule 52(a) of the North Dakota Rules of Civil Procedure.

■ Sharon first contends that the district court failed to comply with the mandate of the Supreme Court on remand. An examination of the record warrants the conclusion that this argument is without merit.

The case was remanded by the Supreme Court on the issue of property distribution. Specifically, the district court was instructed to receive evidence on the value of certain assets held by the Nastroms which were not disclosed at the first trial, and which therefore rendered the district court's findings erroneous. The record reflects that evidence of the value of each of the assets was received at the second trial and considered by the district court in dividing the marital estate.

The value of the mobile home located in Tappen, North Dakota, was determined to be approximately $3,000. The record also indicates that title to the home had previously been transferred to Sharon Werre, the 23-year-old daughter of Sharon and Ned.

The 12½% interest in Dick Fisher Motors of Glasgow, Montana, and the 25% interest in Dan Porter Motors of Dickinson, North Dakota, were both sold by Ned Nastrom subsequent to the first trial. The stock was sold to Dick Fisher and Dan Porter at a net profit to Ned Nastrom of $2,000 and $10,000 respectively.

The partnership interest in Northern Properties, located in Williston, North Dakota, was sold to Don Peterson, and the 90 shares of stock held in Nastrom-Peterson Motors were transferred to Peterson in order to allow Ned to acquire 99% interest in Nastrom-Peterson, Inc., as well as eliminate the debt owed to Peterson.

Finally, the 22½% interest in the leasing enterprise of Triple A Corporation was traded for stock in Western Rent-A-Car at a loss of $10,000 to Ned Nastrom.

All of these transactions occurred after the first trial in September of 1976, but before the second trial in July of 1978. Most of the business interests mentioned above were secured with 100% financing, with no personal investment on Ned's part. The net realization from the sale of Fisher, Porter, Northern Properties, and Triple A Leasing was estimated by Ned to be $8,500. The purpose of these various transactions was to enable Ned to increase his ownership interest in Nastrom-Peterson from 40% to 99%, as well as pay off several outstanding debts owed against the stock of those corporations previously mentioned.

On remand, the district court heard testimony as to the value of the assets not mentioned at the first trial as well as to the value of each of the other assets owned by the Nastroms. The court also heard testimony relating to the conduct of the parties during the marriage.

Based upon the evidence adduced at the second trial concerning the value of the property to be distributed, and the conduct of the parties during the marriage, the district court concluded in its findings of fact:

"5.

"That the present net worth of the parties is approximately $160,000.00, and consists of cash, of capital stock of Nastrom-Peterson, Inc., of capital stock of Western-Rent-A-Car, of capital stock of the Bank of Kirkwood, of the homestead of the parties, of a duplex owned by the

parties, of a forty percent (40%) interest in partnership property identified as 'Nastrom-Peterson-Neubauer land,' of an interest in real property identified as the 'body shop,' of the cash values of insurance policies, of a mobile home, of building lots in Florida, of household furnishings and goods, personal clothing, jewelry, and other miscellaneous items of personal property having a total value of $1,260,000.00; and that the parties have indebtedness outstanding to various financial agencies, individuals, and the United States government in the amount of $1,101,893.00, leaving a net worth of approximately $160,000.00.

"6.

"That the valuations of the capital stock of Nastrom-Peterson, Inc., was a major issue in the retrial proceedings, and that the court finds the value of the stock to be approximately $325,000.00."

Thereafter, in its conclusions of law and order for judgment, the district court made the following property division:

"2.

* * * * * *

"(a) To the plaintiff—the home of the parties, together with all household furniture contained therein   .   .   .

"(b) To the plaintiff—A cash payment of the sum of Ten Thousand Dollars ($10,-000.00)   .   .   .

"(c) To the plaintiff—The sum of Forty Thousand Dollars ($40,000) payable at the rate of $333.33 per month for 120 months   .   .   .

"(d) To the plaintiff—Alimony   .   .   . commencing on November 1, 1978, at the rate of $1,000.00 per month until her death or remarriage   .   .   .

"(e) To the plaintiff—.   .   .   title to the duplex property owned by the parties.

"(f) To the plaintiff—.   .   .   the real property given to the plaintiff herein shall be given subject to any mortgage indebtedness thereon.

"(g) To the plaintiff—.   .   .   title to and possession of a 1977 automobile .   .   .   of the approximate type and kind   .   .   .   in the plaintiff's possession on the 1st day of March, 1977.

"(h) To the plaintiff—.   .   .   $2,000.00 as and for the plaintiff's attorney's fees.

"(i) To the defendant—All other property of the parties."

It is in regard to the above award of alimony, attorney's fees, and the division of property that Sharon appeals to this court.

■ This court has said many times in the past that the trial court's determination on matters of alimony and property division are treated as findings of fact. *Haugeberg v. Haugeberg*, 258 N.W.2d 657 (N.D.1977); *Kostelecky v. Kostelecky*, 251 N.W.2d 400 (N.D.1977); *Larson v. Larson*, 234 N.W.2d 861 (N.D.1975). The findings of the trial court on these matters will not be set aside unless they are clearly erroneous. Rule 52(a), N.D.R.Civ.P. A particular finding of fact is clearly erroneous when, although there is some evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made. *Bender v. Bender*, 276 N.W.2d 695 (N.D.1979); *Bohnenkamp v. Bohnenkamp*, 253 N.W.2d 439 (N.D.1977); *In re Estate of Elmer*, 210 N.W.2d 815 (N.D.1973).

Our scope of review is thus limited by the clearly erroneous rule, and rightly so, for a judge present in the courtroom is in a much better position to ascertain the true facts by listening to and observing the demeanor of the witnesses than we are by reading the cold record.

■ There are no fixed rules by which a trial court is to divide the marital estate in a divorce case. The ultimate objective is to make an equitable distribution, and the determination of what is an equitable division lies within the discretion of the trial court. *Piper v. Piper*, 239 N.W.2d 1 (N.D.1976). This will depend on the facts and circumstances of each case. *Johnson v. Johnson*, 211 N.W.2d 759 (N.D.1973).

Section 14–05–24, N.D.C.C., does provide certain guidelines for the trial court:

"14–05–24. *Permanent alimony—Division of property.*—When a divorce is granted, the court shall make such equitable distribution of the real and personal property of the parties as may seem just and proper, and may compel either of the parties to provide for the maintenance of the children of the marriage, and to make such suitable allowances to the other party for support during life or for a shorter period as to the court may seem just, having regard to the circumstances of the parties respectively. The court from time to time may modify its orders in these respects."

In accordance with this section, and in order to determine whether or not an award of alimony and division of property is clearly erroneous, this court has sanctioned such awards based on the guidelines enumerated in *Ruff v. Ruff*, 78 N.D. 775, 52 N.W.2d 107 (1952) and *Fischer v. Fischer*, 139 N.W.2d 845 (N.D.1966) (hereinafter referred to as the *Ruff-Fischer* guidelines).

■ These guidelines provide that in determining the division of property under Section 14–05–24, N.D.C.C., the trial court may consider the respective ages of the parties to the marriage; their earning abilities; the duration of and the conduct of each during the marriage; their station in life; the circumstances and necessities of each; their health and physical condition; their financial circumstances as shown by the property owned at the time; its value and its income-producing capacity, if any, and whether it was accumulated or acquired before or after the marriage; and such other matters as may be material. *Haberstroh v. Haberstroh*, 258 N.W.2d 669 (N.D.1977); *Hegge v. Hegge*, 236 N.W.2d 910 (N.D.1975).

We have, however, never specifically said that the trial court must make an express finding as to each of the factors enumerated. These guidelines are to be used solely as an aid to the equitable division of marital property.

With these considerations in mind, we must review the trial court's decision to determine whether or not it is clearly erroneous.

First, in light of the *Ruff-Fischer* guidelines, there is not a sufficient variance in the ages of the respective parties to justify different treatment in distributing the property. Therefore, for purposes of the instant case, the importance of this factor is slight.

■ The second factor to consider is the earning ability of the parties. The record clearly shows that Ned has the greater earning ability, and will be better able to support himself in the future. The record shows Ned's net income for the past few years to be as follows:

| Year | Income |
| --- | --- |
| 1970 | $ 22,900 |
| 1971 | $ 31,100 |
| 1972 | $ 19,000 |
| 1973 | $ 29,300 |
| 1974 | $ 50,800 |
| 1975 | $104,500 |
| 1976 | approximately $70,000 |

Ned is presently earning an annual salary of approximately $36,000. His income also includes annual bonuses and many fringe benefits, and is somewhat dependent upon economic conditions existing in Bismarck and the surrounding area, his expertise, and his ability to maintain sales and profit margins at least equal to or greater than previous sales because of the impact of inflation, merchandise costs, salaries, taxes, and other business expenses.

Sharon, on the other hand, has worked outside the home on only a few occasions during the course of the marriage, spanning over 20 years. She has little training in any field, having devoted a substantial part of her productive life to the marriage, raising their three children, handling the family's finances, entertaining Ned's business clientele, and generally providing the type of support and services that a homemaker usually provides. Sharon is young enough to train for a specific occupation or profession, but it is unlikely she will ever have an income comparable to that of her husband.

The record indicates that during the marriage, the needs of Ned, Sharon, and their three children were satisfied almost entirely from Ned's earnings. His earnings in recent years have also been primarily responsible for the accumulation of the parties' property.

The difference in earning capacity justifies requiring Ned to pay alimony, and should be taken into consideration in determining the property division.

■ The next factor to be considered is the duration of the marriage and the conduct of each during the marriage. The Nastroms were married in 1954 and thus were married for about 22 years before the divorce was granted. The evidence shows that Ned had a serious drinking problem which began in the early 1960's while he was working as a car salesman. Ned's drinking problem culminated in his voluntary admission to Menninger's Alcohol Treatment Center in Topeka, Kansas, for six weeks in March of 1977. While apparently under the influence of alcohol, Ned often became involved in disputes with Sharon and the children which often resulted in physical confrontations of one kind or another. Sharon and the children were physically abused by Ned on occasion, and there was an instance when Ned "wounded a garage door", as his counsel stated it, by shooting at the garage attached to the house occupied by Sharon.

However, the evidence is such that the trial court could have reasonably concluded that Sharon was not an innocent party to all of the unpleasantries. Some of the testimony received, which it was the trial court's prerogative to weigh, indicates Sharon, too, had a violent temper, drank in excess on occasion, became involved in heated arguments with Ned, and possibly contributed to abuse of the children. The trial court could reasonably have concluded that neither should be rewarded for reasons of conduct.

We conclude from the evidence presented that the trial court could have reasonably concluded that both must share the responsibility for the failure of their marriage.

With reference to the conduct of the parties, Sharon contends that the trial court's finding as to fault is "clearly erroneous" because of the court's unique approach towards alcoholism.

The trial court emphatically expressed its opinion that alcoholism should not be considered as a matter of fault because it is a disease. The following colloquy between the trial judge and counsel evidences this opinion:

"THE COURT: Do you think drinking is a disease or illness, or what is your concept of alcoholism?

"MR. CHAPMAN: It's a disease.

"THE COURT: Does that contribute, then, to fault, or is it something that he can't help?

"MR. CHAPMAN: Well, it certainly contributes—When you are talking about the fault, that break-up of a marriage, if he is drinking and causing violence in the marriage, certainly that is fault, yes.

"THE COURT: But it's the result of disease—if it is the result of disease, is it fault? Can it be fault?"

Although we believe the trial court erred in concluding possibly that because alcoholism is a disease it should not be considered a matter of fault, we are of the view that this was not reversible error, as there was sufficient other evidence in the record to support the finding that the parties contributed equally to the breakdown of the marriage. Rule 61, N.D.R.Civ.P.; *See Porter v. Porter*, 274 N.W.2d 235 (N.D.1979).

An analysis of several other factors under the *Ruff-Fischer* guidelines, namely the parties' station in life, the circumstances and necessities of each, and the health and physical condition of each, leads to the conclusion that (1) Ned will be in a better position to support himself in the future than Sharon will be, however he will also be burdened by a large indebtedness, whereas Sharon will not be nearly so burdened; (2) with careful budgeting, Sharon's station in life can be maintained and her necessities met through her alimony and cash payment

awards; and (3) both parties have health problems which could significantly affect the picture in the future, but they are of little aid at present in determining property settlement and alimony.

Of great importance and dispute in this case are the financial circumstances of the parties as shown by the property owned, its value, and its income-producing capacity. Neither Ned nor Sharon brought substantial property into the marriage, but over the years they have accumulated a substantial amount of real and personal property, as well as incurred a large indebtedness.

In analyzing this factor, a list of the property acquired by each pursuant to the division of property ordered by the trial court is most helpful. These two lists reflect the net value of the property acquired in a light most favorable to Sharon and Ned, respectively. A perusal of the record indicates that, using values most favorable to Sharon's argument, the parties acquired the following assets and liabilities:

SHARON

| | |
|---|---|
| House (net equity) | $ 46,000 |
| Duplex (net equity) | 15,357 |
| Furnishings | 6,000 |
| Jewelry | 3,000 |
| Cash | 10,000 |
| Future Cash—payable at a rate of $333.33 per month for ten years | 40,000 |

In addition, Sharon receives alimony at the rate of $1,000 per month until death or remarriage; attorney's fees in the amount of $2,000; and a 1977 automobile.

| | |
|---|---|
| NET VALUE | $120,357 |

NED

| | |
|---|---|
| Nastrom-Peterson stock (99% interest) | $ 800,000 |
| Nastrom-Peterson-Neubauer Land (40% interest) | 290,000 |
| Nastrom-Peterson Body Shop (½ interest) | 60,000 |
| Guns | 10,000 |
| Jewelry | 8,000 |
| Florida land | 5,000 |
| Life insurance—cash value | 5,000 |
| Cash | 3,000 |
| Mobile Home | 3,000 |
| Bank of Kirkwood stock | 1,500 |
| 2 snowmobiles/trailer | 500 |
| Leases (oil and gas) | 200 |
| Budget Rent-A-Car stock | --- |
| | $1,186,200 |

Less Liabilities:

| | |
|---|---|
| First Nationl Bank of Bismarck (40% of $620,000 mortgage) | 248,000 |
| First National Bank of Bismarck | 140,000 |
| Bank of Kirkwood | 90,000 |
| John Fleck (½ of $67,500 Contract) | 33,750 |
| Judgment—Cash | 10,000 |
| —Future Cash | 40,000 |
| Attorney's Fees | 2,000 |
| | $563,750 |
| | $622,450 |

Using values most favorable to Ned's argument, in accordance with the testimony and other evidence introduced on his behalf, the parties acquired the following assets and liabilities, along with their correspondent values:

SHARON

| | |
|---|---|
| House (net equity) | $ 46,000 |
| Duplex (net equity) | 15,357 |

NED

| | |
|---|---|
| Nastrom-Peterson Stock (99% interest) | $325,000 |

SHARON

| | |
|---|---|
| Furnishings | 6,000 |
| Jewelry | 3,000 |
| Cash | 10,000 |
| Future Cash | 40,000 |

In addition, Sharon receives alimony at the rate of $1,000 per month until death or remarriage; attorney's fees in the amount of $2,000; and a 1977 automobile.

NED

| | |
|---|---|
| Nastrom-Peterson-Neubauer Land (40% interest) | 290,000 |
| Nastrom-Peterson Body Shop (½ interest) | 40,000 |
| Guns | 10,000 |
| Jewelry | 8,000 |
| Florida Land | 5,000 |
| Life insurance—cash value | 5,000 |
| Cash | 3,000 |
| Mobile Home | 3,000 |
| Bank of Kirkwood Stock | 1,500 |
| 2 snowmobiles/trailer | 500 |
| Leases (oil and gas) | 200 |
| Budget Rent-A-Car stock | - - - |
| | $691,200 |

Less Liabilities:

| | |
|---|---|
| First National Bank of Bismarck (40% of $620,000 mortgage) | 248,000 |
| First National Bank of Bismarck | 140,000 |
| Bank of Kirkwood | 90,000 |
| Internal Revenue Service | 35,000 |
| John Fleck (½ of $67,500 Contract) | 33,750 |
| Judgment—Cash | 10,000 |
| —Future Cash | 40,000 |
| Attorney's Fees | 2,000 |
| | $598,750 |

| | | |
|---|---|---|
| NET VALUE | $120,357 | $ 92,450 |

Ned will also be obligated to pay alimony in the amount of $1,000 per month until Sharon's death or remarriage, and will be required to turn over to Sharon title to the 1977 automobile which she is presently in possession of.

It should be noted in light of the extent of the total assets and liabilities in this case and the dispositions made of the property for which this case was remanded for a new trial, that the crucial issues in this case are not appreciably affected by the valuation of that property.

Returning to a consideration of the assets and liabilities, it appears, then, that the major differences in the two lists are the values attributed to the Nastrom-Peterson stock, the Nastrom-Peterson Body Shop,

and the obligation owed to the Internal Revenue Service.[2]

A major issue in the retrial proceeding, and the real dispute between the parties on appeal, was and is the valuation of the capital stock of Nastrom-Peterson, Inc., of which Ned now owns a 99% interest. The trial court heard evidence relative to the value of the Nastrom-Peterson stock from two witnesses, Joseph Perfetti, a public accountant from Minneapolis, Minnesota, and Claude Anderson, a certified public accountant, also from the Twin Cities.

Perfetti, testifying on behalf of Sharon Nastrom, stated that the Nastrom-Peterson stock owned by Ned Nastrom was worth $800,000, whereas Anderson testified that the stock had a value of $325,000. Both witnesses relied on different factors to eval-

2. The $35,000 liability to the Internal Revenue Service is vigorously disputed by counsel for the plaintiff-appellant. However, there is evidence in the record to support the finding that

said obligation exists. If it turns out that this obligation is for some reason changed, then Sharon could seek a modification of judgment pursuant to Section 14–05–24, N.D.C.C.

uate the stock, and the dispute centers around the proper method of evaluation *i. e.*, whether or not book value is a reasonable basis for determining value or whether or not other factors such as the net value of the assets, the underlying assets, net worth, earning power, economic outlook, position of the company in the industry, the management track record, degree of control, financial trends, and the dividend-paying capacity of the organization must be considered.

In *Lynch v. Lynch*, 195 Neb. 804, 241 N.W.2d 123 (1976), the Supreme Court of Nebraska was faced with a similar problem in a divorce action. The evidence with respect to the value of a business owned solely by the husband was conflicting, and estimates ranged from $80,000 to $500,000. In *Lynch*, the court stated the general rule to be, in cases of conflicting testimony, that the reviewing court will give great weight to the findings of the trial court because it "observed the witnesses and their manner of testifying," and thus is better able to accept one version of the facts over another version. *Lynch, supra* at 126. All due regard should be given to the opportunity of the trial court to judge the credibility of the witnesses. Rule 52(a), N.D.R.Civ.P. The mere fact that this court might have viewed the facts differently, if it had been the initial trier of the case, does not entitle it to reverse the lower court. *Bender v. Bender*, 276 N.W.2d 695 (N.D.1979); *State v. Livingston*, 270 N.W.2d 556 (N.D.1978).

Not having been shown that accepted accounting practices favor one method of determining value over another, we conclude that the trial court's acceptance of the certified public accountant's version of the value of the stock is not clearly erroneous.

We reach the same conclusion with respect to the different values attributed to the Nastrom-Peterson Body Shop.

Eugene Weeks, an independent appraiser, valued the body shop property at approximately $120,000. However, Ned Nastrom testified that the value of the property was approximately $74,000, and other evidence in the record indicates that the value of said property was approximately $80,000.

For the reasons previously stated, the trial court's decision to accept one version of the value of the property over another is not clearly erroneous.

■ The final *Ruff-Fischer* guideline requires consideration of any other material matter. The trial court here could certainly consider Ned's future earning potential; the fringe benefits and bonuses Ned receives from his position with Nastrom-Peterson, Inc., along with his annual salary of $36,000; the conflict in the evidence as to the value of some properties; the various stock transactions occurring subsequent to the first trial to apparently enable Ned to acquire a 99% interest in Nastrom-Peterson Motors, Inc.; the conduct of the parties throughout the duration of the two trials; their attitudes and their disposition, as well as any other matter which the trial court, in its discretion, deemed material to the distribution of the property.

■ Taking into consideration all of the guidelines discussed above, the division of property must be affirmed. We are not left with a firm and definite conviction that a mistake has been made in this case. Although the findings of fact could have been drawn in a manner which would have more clearly set forth the basis for the trial court's distribution of the property, a property division will not be set aside on the grounds of failure to show the basis for it if that basis is reasonably discernible by deduction or inference. *Mattis v. Mattis*, 274 N.W.2d 201 (N.D.1979); *Fine v. Fine*, 248 N.W.2d 838 (N.D.1976). We conclude that there is a sufficient basis in the record for the court's distribution.

■ Sharon contends that the trial court must set forth the value of each of the assets and offsetting liabilities in its findings in order to arrive at a net worth of the marital property.

We stated in *Hoge v. Hoge*, 281 N.W.2d 557, 561 (N.D.1979):

"When there is evidence upon which the court can arrive at an equitable property

division, justice requires use of the elementary accounting equation of assets minus liabilities equals total equity. From this equation it is possible to determine the net worth of the marital property."

Despite Sharon's contention, this language does not place an absolute requirement upon the trial court to set forth in its findings the value of individual items making up the net worth of the parties. To require such an itemized listing of the assets and offsetting liabilities, along with their correspondent values, would place an unnecessary burden upon the trial judges in this state. To the extent that the record reflects that the trial court heard evidence as to the value of each of the assets and liabilities, and applied the accounting equation of assets minus liabilities equals total equity in determining the parties' net worth, the division of property will not be overturned unless clearly erroneous.

In the instant case, the trial court properly applied this basic principle. The assets and liabilities taken into consideration were listed in paragraph form in number 5 of the trial court's findings of fact, and the trial court thereafter stated that the total value of the assets amounted to $1,260,000 and the indebtedness outstanding $1,101,893, leaving a net worth of approximately $160,-000. Therefore, the trial court properly determined the net worth of the marital estate as required by *Hoge*.

■ Sharon also asks this court to reconsider and modify our determination that the future earning potential of the husband is not an asset that should be considered by the court in making a property division. This we decline to do. *See Nastrom v. Nastrom*, 262 N.W.2d 487, 493 (N.D.1978).

■ Finally, Sharon contends that the trial court erred in fixing attorney's fees and costs at only $1,000 more than previously awarded at the end of the first trial, particularly after which there was a successful appeal to the Supreme Court, as

well as further trial preparation for the second trial and a successful defense to a motion to dismiss this appeal.

The awarding of attorney's fees necessary to prosecute or defend an action for divorce is within the discretion of the trial court pursuant to Section 14–05–23, N.D. C.C. The trial court's decision will not be interfered with unless the appealing party affirmatively establishes that the trial court has abused its discretion. *Haberstroh v. Haberstroh, supra; Haugeberg v. Haugeberg, supra; Bohnenkamp v. Bohnenkamp, supra.*

In making the determination of what part of the wife's attorney's fees should be paid by the husband, the trial court should consider the property owned by each party as a result of the property division; their relative incomes; whether the wife's property is in liquid or fixed assets; whether or not the wife's actions unreasonably increased the time spent on the case; and whether or not the husband's actions unreasonably increased the time spent on the case. *Lien v. Lien*, 278 N.W.2d 436 (S.D. 1979).

Upon consideration of these factors, as well as others relevant to the disposition of this case, we conclude that Sharon has not affirmatively established that the trial court abused its discretion in the award of attorney's fees. We therefore uphold the trial court's award in this respect.

For the reasons stated in this opinion, the judgment of the district court is affirmed.

VANDE WALLE, PEDERSON, PAULSON and SAND, JJ., concur.