Marion Elaine **MIDBOE**, Plaintiff, Appellant and Cross-Appellee,

v.

Marvin **MIDBOE**, Defendant, Appellee and Cross-Appellant.

Civ. No. 9843.

Supreme Court of North Dakota.

March 25, 1981.

Nelson, Kalash & Gronneberg, Grand Forks, and Chapman & Chapman, Bismarck, for plaintiff, appellant and cross-appellee; argued by Daniel J. Chapman, Bismarck.

Dahl, Greenagel & Geiger, Grafton, for defendant, appellee and cross-appellant; argued by M. Richard Geiger, Grafton.

SAND, Justice.

This is an appeal by the plaintiff, Marion Midboe [Marion], from a district court judgment granting a counterclaim for divorce to the defendant, Marvin Midboe [Marvin], and dividing the property of the parties. Marvin cross-appealed from the same judgment.

Marvin and Marion were married on 21 Dec 1947 and began farming near Inkster, North Dakota. In 1977 Marion initiated an action for separation against Marvin, who counterclaimed for divorce on the grounds of irreconcilable differences. Marion sought and obtained an interim order which ordered Marvin to stay away from the Inkster farmland. Marion, with the help of her son George, continued to farm the land near Inkster. Marion's attorney withdrew from the case, and she appeared as her own attorney in all subsequent proceedings before the district court. The case was set for trial before Judge Kirk Smith.

Marion contacted Judge Smith prior to trial and requested that her case be dismissed. The Judge explained to her that even if the dismissal were granted, Marvin's counterclaim would still remain to be tried. Marion then inquired as to the possibility of obtaining a different judge if a trial was to be held. The Judge informed her that she should make the request in open court at the time the trial was scheduled, on 13 Feb 1980, and he would consider it at that time.

On 13 Feb 1980 Marion, in open court, moved for dismissal of her action for separation, which was granted, and the court then asked Marvin if he intended to continue with his counterclaim for divorce. Marvin responded that he intended to pursue his counterclaim. Marion renewed her request that a different judge be named to hear the case. The record reflects that the following dialogue then transpired:

"THE COURT: I would like the record to state that I have no feelings of bias or prejudice as to either party in the case but it is true that certain proceedings were had between the parties before me in the county board [sic] during the time that I was county judge some seven or eight years ago and Mrs. Midboe has made reference to those matters relative to this and it would be my judgment that since a change of judge can be had forth-

with and that the trial can go forward without any delay that no persons would be injured thereby by reason of a delay for change of judge and the Court being satisfied that even though I have no attitude or feeling of bias or prejudice for or against either party in this case that *in view of Mrs. Midboe's statements which you have made and which were made to the presiding judge* and which have been filed in the record of the case that it would be appropriate and proper for me to excuse myself and to allow the case to go forward forthwith before Judge Medd in Courtroom No. 3. And he has been notified of this possibility and all we have to do then is to ask you to reposition yourselves in Courtroom No. 3 and the file and the clerk will go forward to him and the case can proceed.

"Is there any question?

"MR. GREENAGEL: None Your Honor.

"THE COURT: Any question from you, Mrs. Midboe?

"MRS. MIDBOE: No, Your Honor.

"THE COURT: Very well. So ordered." [Emphasis ours.]

Before Judge Medd proceeded to hear the case he asked Mrs. Midboe, "And are you ready to proceed with the trial?" Mrs. Midboe replied, "Yes."

The trial proceeded on 13 Feb 1980 and evidence was received to determine whether or not irreconcilable differences existed as grounds for the divorce. The district court found irreconcilable differences and a divorce was granted.

A second hearing was held on 13 March 1980 to introduce evidence regarding the division of property. After this hearing the court issued a decision reaffirming its decision to grant a divorce and setting forth a division of property. Judgment was entered from which Marion appealed and Marvin cross-appealed to this Court.

1. We take judicial notice that Judge A. C. Bakken is the presiding judge of the Northeast Central Judicial District.

The first issue raised by Marion relates to the manner in which her case was transferred from Judge Smith to Judge Medd. Marion asserts that after Judge Smith's disqualification, he improperly transferred the case to Judge Medd in a manner that deviated from the procedure set forth for the selection of a judge in such circumstances. See § 29–15–21, North Dakota Century Code, and North Dakota Supreme Court Administrative Rules AR2–1978(9). Marion asserts that any action taken by Judge Medd is, at best, voidable.

Initially we note that the procedures of AR2–1978(9) in substance provide that the presiding judge [1] shall make assignments of judges within the judicial district whenever a demand for change of judge is made pursuant to § 29–15–21, NDCC. Rule AR2–1978(9) also provides that a copy of demand for change of judge and a copy of the assignment shall be sent to the clerk of the Supreme Court for approval by the Chief Justice. If the demand for change of judge is against the presiding judge, or if the presiding judge is unable to make an appropriate assignment among the judges within a judicial district, the presiding judge shall refer the demand to the clerk of Supreme Court for assignment by the Chief Justice.

Rule AR2–1978(9) is designed to insure fairness and to prevent a judge against whom a demand for change has been filed to designate his successor. While we are satisfied a judge would not deliberately seek out a successor who might share his judicial philosophy, the parties, however may have a different view. Compliance with the rule will also avoid what otherwise might appear to be an unfair procedure.

In this instance, we note that Judge Smith, in his statement from the bench quoted earlier herein, mentioned that Marion's statements requesting a change of judge had been made to the presiding judge. This reference clearly implies that the presiding judge was notified concerning

Marion's request and acted upon the request. Further support for this implication exists in the presumption that an official charged with performing an official duty has performed that duty regularly. Section 31–11–03(15), NDCC. From the beginning we can infer that the presiding judge was informed and made or approved of the assignment of the case to Judge Medd. The record does not reflect that a written demand for change of judge was made or that a copy of the demand for change of judge and a copy of the assignment was sent to the clerk of the Supreme Court for approval by the Chief Justice.

Obviously, some of the ministerial functions or steps could not be carried out because the demand for change of judge was not in writing. We do not believe that failure to carry out all of the ministerial functions is fatal under the totality of circumstances of this case. We reach this conclusion even though the record does not contain any documentation other than the comments by Judge Smith as to whether or not the presiding judge was contacted or acted upon the demand for change of judge.

In our final analysis we cannot avoid a pertinent but obvious question: In what manner, if any, were the litigants deprived of justice by the procedure that was followed? We believe that the overwhelming goal or objective of the demand for change of judge and the subsequent designation of the replacement is to provide the parties with an unprejudiced, unbiased judge to hear the case.

Throughout the arguments made by counsel on appeal, neither side even hinted that the judge designated to hear the case was prejudiced or biased against one side or the other. Nor does the record reflect that any such bias or prejudice possibly existed. Further, Marion appealed and Marvin cross-appealed. This clearly illustrates that neither party was satisfied with the trial court's decision and dispels any notion of prejudice or bias toward one party. In addition, neither party objected to the assignment of the case to Judge Medd. Taking into account the totality of the circumstances, particularly that no written demand for change of judge was made and that the oral request apparently triggered the Judge to recuse himself, and the judicial economy involved we cannot in good conscience conclude that a retrial should be had before another judge on this issue alone. We nevertheless encourage a judge who disqualifies himself to follow the procedures outlined in Rule AR2–1978(9) as if a written demand for change of judge had been made.

■ Marion also asserts that the evidence presented to the district court was not sufficient to warrant the finding of irreconcilable differences. Marion opposed the divorce in the trial court and now argues that except for Marvin's bare statement that irreconcilable differences exist there is no evidence supporting the finding of such differences. Marion also asserts, in substance, that any "fault" in the marriage relationship is attributable solely to Marvin, and, as such, Marvin should not be able to take advantage of his conduct as grounds for the divorce.

This Court's review of the finding of irreconcilable differences is governed by the "clearly erroneous" standard of Rule 52(a), North Dakota Rules of Civil Procedure. *Larson v. Larson*, 234 N.W.2d 861 (N.D. 1975).

Irreconcilable differences are defined in § 14–05–09.1, NDCC, as:

"... those grounds which are determined by the court to be substantial reasons for not continuing the marriage and which make it appear that the marriage should be dissolved."

Irreconcilable differences as grounds for divorce was adopted to eliminate the public accusation of wrongdoing by the parties. *Rummel v. Rummel*, 265 N.W.2d 230 (N.D. 1978). In such cases the assignment of blame has been replaced by a search for the realities of the marital situation and a determination of whether or not the marriage has ended in fact. See, Commissioner's Note to Uniform Marriage and Divorce Act, 9A Uniform Laws Annotated, Master Edi-

tion, page 133; New Topic Service, Am. Jur.2d, No-Fault Divorce, § 2, page 3.

We have said that:

"In determining a divorce action on irreconcilable differences the court need only find that irreconcilable differences exist and is not required to go into the conduct or, as it is sometimes referred to, the fault of the parties." *Rummel v. Rummel, supra* at 234.

The record reflects a basic disagreement between Marion and Marvin concerning Marvin's use of alcohol or mental health, or both. Marion has on more than one occasion unsuccessfully attempted to have Marvin committed to the State Hospital for treatment. We do not believe it would be beneficial to either party to go into the details of their disagreements or to go into the conduct of either party. We specifically note that Marvin testified that there was no possibility of the marriage being reconciled and of him and Marion getting back together again.

After a careful review of the record and the realities of the marital situation in this instance, we cannot say that the district court's finding of irreconcilable differences was clearly erroneous.

In the final issue raised the parties claim the district court's property division was inequitable. Both Marvin and Marion have appealed on this issue and assert that the trial court's division of property was clearly erroneous.

■ Section 14–05–24, NDCC, requires that the trial court make an equitable distribution of the real and personal property of the parties when a divorce is granted. There are no fixed and rigid rules by which the trial court is to divide up the marital estate, and a determination of what is an equitable distribution depends upon the facts and circumstances of each case. *Lapp v. Lapp*, 293 N.W.2d 121 (N.D.1980). It is well established that the following factors may be considered by the trial court in making an equitable distribution of property:

"... the respective ages of the parties to the marriage; their earning abilities; the duration of and conduct of each during the marriage; their station in life; the circumstances and necessities of each; their health and physical condition; their financial circumstances as shown by the property owned at the time; its value at that time; its income-producing capacity, if any, and whether it was accumulated or acquired before or after the marriage; and such other matters as may be material. *Bender v. Bender*, 276 N.W.2d 695 (N.D.1979); *Fischer v. Fischer*, 139 N.W.2d 845 (N.D.1966); *Ruff v. Ruff*, 78 N.D. 775, 52 N.W.2d 107 (1952)." *Bosma v. Bosma*, 287 N.W.2d 447, 450 (N.D.1979).

■ The trial court's division of property is treated as a finding of fact and will not be set aside unless it is clearly erroneous pursuant to Rule 52(a), NDRCivP. *Bosma v. Bosma, supra; Nastrom v. Nastrom*, 284 N.W.2d 576 (N.D.1979).

■ In this instance Marvin received property having a value of approximately $240,000. Included in this property is approximately 250 acres of farmland having a rental value of $70 per acre. Marvin also received some additional personal property having an undetermined value.[2]

Marion received property having a value of approximately $380,000. Included in this property is approximately 300 acres of tillable land with a rental value of $35 to $40 per acre and approximately 110 acres of pasture with a rental value of $25 per acre.

Marion asserts that the property division was inequitable because it awarded a "lion's share of the property" to Marvin to "maintain his station in life," and that Marvin could maintain his station in life by renting his land, while Marion had to continue the farming operation to maintain her station in life. Marion also asserts that there should be some indication in the trial court's

2. This personal property included a 1976 mower, a 1950 tractor, a 1968 cultivator, a 1978 pickup, a 1970 mower, a used road blade, a rocker, a wheelbarrow, and a sewing machine of Marvin's mother.

findings as to why it divided the property as it did.

Marvin asserts that the trial court was clearly erroneous in not awarding 40 head of cattle[3] to him because, as he asserts, it was his labor that built up the cattle herd.

In *Bosma v. Bosma, supra* at 450–51, we said that:

"Although we have never specifically said that the trial court must make an express finding as to each of the factors enumerated, we encourage trial courts to carefully consider the *Ruff-Fischer* guidelines in equitably distributing the marital estate, and in determining awards of alimony and child support."

Although the factual basis for the division of property, as set forth in the memorandum opinion, is not as complete as it should be, the memorandum opinion does mention the ages of the parties; the earning abilities of the parties as reflected by 1978 Federal income tax forms and their work experience;[4] the length of the marriage; and the market value and rental value of the property owned at the time of the divorce. We must conclude that the trial court in mentioning these factors, considered them in making the division of property.

The record also reflects that some of the 40 cattle belonged to the Midboe's son, George. Furthermore, the record reflects that Marion and George continued the cattle and farming operation after Marvin was ordered away from the Inkster land. In view of these circumstances we do not believe it was inequitable to award the cattle to Marion.

It is also apparent that Marvin did not receive a "lion's share of the property." Rather it appears that Marion received property having a greater value. However, when the rental values of the real property, coupled with the income-earning abilities of

the parties and the undetermined value of the personal property received by Marvin are considered, we cannot conclude that this disparity is inequitable. Furthermore, neither party gave any cogent reasons why the property should have been distributed differently as a matter of law.

After a careful review of the record, we cannot conclude that the district court's division of property was clearly erroneous.

Accordingly, for reasons stated in this opinion the judgment of the district court is affirmed.

ERICKSTAD, C. J., and VANDE WALLE, PEDERSON and PAULSON, JJ., concur.

---

**3.** Included in the property awarded to Marion was approximately 40 head of cattle valued at approximately $20,000.

**4.** The record reflects that Marvin's income, in part, resulted from renting land in the Walsh County area, farm work, and odd jobs. Marion's income, in part, resulted from the farming operation in Inkster, interest income, and the cattle operation.