Jewel M. FRAASE, Plaintiff
and Appellee,

v.

Mark R. FRAASE, Defendant
and Appellant.

Civ. No. 10057.

Supreme Court of North Dakota.

Jan. 21, 1982.

Irvine, Ramstad, Quam & Briggs, Detroit Lakes, Minn., for plaintiff and appellee; argued by John C. Quam, Detroit Lakes, Minn.

Wegner, Fraase, Nordeng & Johnson, Fargo, for defendant and appellant; argued by Mervin Nordeng, Fargo.

ERICKSTAD, Chief Justice.

Jewel M. Fraase commenced an action for divorce from Mark R. Fraase on the grounds of irreconcilable differences. Mark counterclaimed on the grounds of irreconcilable differences and later amended his counterclaim to request a divorce on the grounds of adultery. Both parties sought custody of the children. The trial was held in the District Court of Traill County. The court granted the divorce on grounds of irreconcilable differences, awarded custody of the children to Jewel, set the child support, and divided the property. Mark moved for a new trial and to amend the findings of fact, conclusions of law, order for judgment, and judgment. Those motions were denied. Mark has appealed from the judgment and the orders denying his motions.

On appeal, Mark contends that the trial court erred in awarding custody of the children to Jewel, that the property distribution was inequitable, and that the established child support payments are too high. In divorce actions, the trial court's determination on matters of child custody, child support, and division of property are treated as findings of fact and will not be set aside unless they are "clearly erroneous". *DeForest v. DeForest*, 228 N.W.2d 919, 923 (N.D.1975); *Bender v. Bender*, 276 N.W.2d 695, 697 (N.D.1979). We have reviewed the trial court's findings and affirm in part, modify in part, and remand with instructions.

Jewel and Mark were married on June 26, 1970, at Jacksonville, North Carolina. At the time of the marriage, Jewel was in the Marine Corps and pregnant with Mark's child. Jewel miscarried that child three

days after the marriage. The couple eventually had two children during their 11-year marriage.

Mark was 35 years old at the time of the marriage. He was engaged in the practice of law and had accumulated real and personal property which he brought into the marriage. Jewel had essentially no assets at the time of the marriage. After their marriage in 1970, Jewel worked for a time at Northwestern Bell and, in 1977, started babysitting full time. During the 11-year marriage, the couple accumulated additional property.

### Property Division

The trial court, in essence, described, evaluated, and divided the property in its findings of fact as follows:

| To Mark Fraase | | Value |
|---|---|---|
| Farm land, 320 acres (Mark owned at time of marriage) | | |
| Value at marriage | $ 52,800.00 | |
| Appreciation | $170,000.00 | $222,800.00 |
| ⅛ of furniture | | $ 1,000.00 |
| 1976 Fiat automobile | | $ 1,500.00 |
| Condominium at Detroit Lakes | | $ 18,000.00 |
| Lake Lot (Mark owned at time of marriage) | | $ 3,500.00 |
| Alice Elevator stock | | $ 10,000.00 |
| Second Investment home in West Fargo | | $ 5,000.00 |
| Increase in equity in law partnership | | $ 35,000.00 |
| Tractor and attachments | | $ 2,500.00 |
| Savings Account | | $ 52.00 |
| | | $299,352.00 |
| Less mortgage of $25,000 ($10,000 of which was used to pay Mark's debt at the time of marriage) | $25,000.00 | |
| Less $10,000 marital debt on note owing First National Bank | $10,000.00 | $ 35,000.00 |
| Net amount received | | $264,352.00 |
| To Jewel Fraase | | |
| The marital home in West Fargo net value after mortgages deducted | | $ 38,000.00 |
| ⅝ of furniture | | $ 5,000.00 |
| 1978 Fiat automobile | | $ 3,500.00 |
| Savings account | | $ 2,000.00 |
| Net amount received | | $ 48,500.00 |

Mark argues that this division of property was not equitable and therefore did not fall within the guidelines enumerated in *Ruff v. Ruff*, 78 N.D. 775, 52 N.W.2d 107 (1952) and *Fischer v. Fischer*, 139 N.W.2d 845 (N.D.1966) (*Ruff-Fischer* guidelines). Specifically, he argues concerning the division of property:

1. The trial court ignored the fact that some property he brought into the marriage no longer exists.
2. The trial court erred by including in the marital estate the amount of $35,000 which the court set as the value of Mark's interest in his law firm.
3. The court did not include in its findings of values several debts which it imposed upon Mark.

In its conclusions of law, the trial court said it applied the guidelines of *Ruff-Fischer*. Those guidelines are as follows:

"In determining the question of alimony or division of property as between the parties, the court, in exercising its sound discretion, will consider the respective ages of the parties to the marriage; their earning ability; the duration of and the conduct of each during the marriage; their station in life; the circumstances and necessities of each; their health and physical condition; their financial circumstances as shown by the property owned at the time, its value at that time, its income-producing capacity, if any, and whether accumulated or acquired before or after the marriage; and from all such elements the court should determine the rights of the parties and all other matters pertaining to the case." (Citations omitted.) *Fischer v. Fischer*, 139 N.W.2d at 852.

We first address Mark's argument that the court erred by ignoring in its distribution of property certain property brought into the marriage by him. He takes issue with the trial court's finding that he "ends up the marriage with . . . all the property he owned at the time of the marriage. . . ." He asserts that the court ignored $4,000 worth of growing crops, $4,200 worth of stored grain, a ring worth $600 and a life insurance policy cashed in during the marriage of a value of $6,000, all of which he brought into the marriage.

The *Ruff-Fischer* guidelines do encourage trial courts to consider the property owned

by the parties and whether it was "accumulated or acquired before or after the marriage...." *Id.* Although we have recognized that the time of the acquisition of property and its source is significant, we have nevertheless held that property acquired prior to the marriage by one spouse should be considered as part of the marital estate in determining what an equitable division would be. *Fine v. Fine,* 248 N.W.2d 838, 841 (N.D.1976); *Hultberg v. Hultberg,* 259 N.W.2d 41, 44 (N.D.1977). We have never said that the trial court must make an express finding as to each of the factors enumerated by the guidelines. Instead, we have said that the guidelines are solely an aid to the equitable division of marital property. *Nastrom v. Nastrom,* 284 N.W.2d 576, 581 (N.D.1979).

█ The ultimate objective in dividing the marital estate in a divorce case is to make an equitable distribution, and the determination of what is an equitable division lies within the discretion of the trial court. *Id.* at 580; *Piper v. Piper,* 239 N.W.2d 1 (N.D.1976). After reviewing the findings of fact, we conclude that the trial court did consider the items disputed by Mark. The court, however, said it had "very little information as to other assets in that no evidence was presented to establish value." In reviewing the evidence presented, we do not conclude the court's findings to be clearly erroneous or the division of property inequitable.

█ The trial court discussed in its findings of fact all the property brought into the marriage by Mark and in its award distributed approximately $215,000 more in property to Mark than to Jewel. The $215,000 is accounted for by the farm land and lake lot owned by Mark prior to the marriage. While Mark did bring additional property into the marriage, the trial court is not required to award all that property to him. The fact that property subject to distribution was acquired by one of the parties prior to the marriage is a consideration weighing in favor of that party, but it does not prevent the court from awarding part or all of the property to the other

party should an equitable distribution require it. *Fine v. Fine,* 248 N.W.2d 838, 841 (N.D.1976); *Hultberg v. Hultberg,* 259 N.W.2d 41, 44 (N.D.1977).

Except for the farm land valued at approximately $223,000, and the lake lot valued at $3,500, Mark received approximately $38,000 in value and Jewel received approximately $48,000 in value. When we consider that the court treated $10,000 of the $25,000 mortgage as an obligation incurred by Mark prior to marriage, the values are approximately equal. The court could reasonably have concluded that Jewel's contributions to the marriage as a homemaker justify such a share, notwithstanding that Mark brought into the marriage or contributed to the marital estate another $14,800 which may or may not be traceable at this time. The court might also have reasonably considered that Jewel gave up career opportunities to care for Mark and their children and that her resulting earning capacity is much less than Mark's.

█ Mark's second argument concerning the property distribution is that the trial court erred in finding that Mark's interest in his law firm had increased by $35,000 over its value on the date of his marriage. The trial court included that $35,000 value in the marital estate which it divided in making a distribution of property. Mark argues that his law practice was actually worth less at the time of the divorce than it was at the time of his marriage to Jewel. In fact, he asserts that if he were to walk away from the partnership he would receive nothing. He therefore contends that his interest is worthless. We disagree.

In finding of fact 38, the trial court said:

"38. The value of the law business of which Mark is a partner was not gone into with particularity. Mark contends the value of the law practice is less now than at the time of the marriage because of the physical illness of a partner. A financial statement of the partnership shows a net worth in 1978 of $53,952.00 and the share of Mark was $19,917.02. The financial statement for 1979 showed

a net worth of $78,234.90 and Mark's share of the net worth was $31,194.47. The difference is due to the increase in accounts receivable. The capital valuation is strictly an accounting valuation taking into consideration the depreciation. It has very little relationship to the true value of the physical assets. While a going law firm partnership does have some resale value, the value is somewhat dependent on the abilities of the incoming partner. Mark testified that if he should leave the firm, that he would turn over all assets to the remaining partners free. No written or oral agreement between the partners exist as to the rights of a partner who leaves. The office has the usual law books, furniture, fixtures and office equipment. This Court cannot operate and rule in a vacuum but must consider the office practice as having some value greater than in 1970 when Mark had been in practice for a mere four years. This Court finds that the value of the office equipment, furniture, fixtures and the practice itself as owned by Mark has an increase in value from 1970 to the present of at least $35,-000.00."

We do not accept Mark's argument that his interest in the law firm has no value. The trial court must make findings of fact. *See* Rule 52(a), N.D.R.Civ.P. Those factual findings are made by reviewing the evidence, listening to the testimony, and judging the credibility of the witnesses. A partner's interest in a law firm, where not otherwise provided by contract, includes as a minimum his interest in the office equipment, furniture, fixtures, and the accounts receivable. Those accounts receivable include finished as well as unfinished business. We are not convinced that a mistake was made in this determination and thus this determination is not clearly erroneous.

Mark also argues that the trial court's inclusion of the law firm value in the marital estate for property division purposes and then using his income-earning capacity to determine the child-support award is actually considering Mark's income twice, thereby dividing it twice. Because we have determined that the trial court's finding that Mark's interest in his law firm had a value of $35,000 without considering his future income was not clearly erroneous, Mark's argument that the trial court used his income-earning capacity twice is without merit.

Mark's third argument concerning the property distribution is that the court imposed debts upon him which it did not include in its findings of values. He contends that the trial court did not consider the $4,000 which it required him to pay for Jewel's attorney's fees, a $2,000 credit card debt, approximately $5,000 additional income taxes resulting from the transfer of the joint tenancy house to Jewel, and approximately $4,500 in income tax liability accruing because the court did not require Jewel to join in a joint tax return.

Although the trial court did not include these debts in its listing of the distribution of property, it did consider the debts. In finding of fact 53, the trial court said:

"Defendant shall be obligated to pay all other debts of the parties including but not limited to the promissory notes to the banks, the mortgage on the farm land, the credit card charges, and all income taxes owing for the year 1980 plus any income tax consequences that may be due because of the distribution of the property herein. All debts incurred by Jewel for her own purposes subsequent to January 27, 1981 shall be her sole obligation."

The trial court, in this finding of fact, found Mark obligated to pay all debts incurred by the parties during their marriage, including taxes. In his motion to amend the findings of fact, conclusions for law, and order for a new judgment, Mark requested that Jewel be required by the court to join him in an amended joint income tax return. At the hearing on that motion, Jewel agreed to join in a return if Mark were to reimburse her $875 for the taxes she paid for 1980. Mark argued that he was not liable for the entire $875 because $348 of that amount was due for self-employment social security payments. The

trial court said that it intended Mark to be responsible for all taxes for which Jewel was liable, including social security payments. The court then denied Mark's motion.

■■ We believe the trial court's denial of Mark's motion resulted in an unnecessary penalty to him. The court might have granted Mark's motion requiring Jewel to sign a joint income tax return and at the same time ordered Mark to reimburse Jewel $875 for the taxes she paid. During arguments presented at the hearing on Mark's motion, however, his attorney indicated that the Internal Revenue Service had given Mark until September 15, 1981, to file a joint return. That time has since passed. We reverse the order as to this possible amendment of the judgment and remand for a determination of whether or not an amended joint return may still be filed. Mark should not have been required to reimburse Jewel for her contributions to social security because those contributions relate solely to her retirement. If the trial court concludes that the amendment may still be made, we herewith order the trial court to order an amendment to the judgment accordingly.

■ Mark contends that the trial court should have ordered Jewel to execute a quitclaim deed in order to clear the title to his condominium. He argues alternatively that the title could be cleared under Minnesota Title Standards by placing the legal description of the property in the judgment and having that judgment recorded. We agree with Mark that the trial court should have either included the legal description of the property in the findings of fact, conclusions of law, and order for judgment so that it would be in the judgment, or it should have required Jewel to execute a quitclaim deed. On remand, we ask that the trial court so order.

## Child Custody

■ The trial court found that the best interests of the two minor children would be best served by placing them in the custody of Jewel with visitation rights in Mark. Mark contends that this finding is "clearly erroneous". After a review of the testimony and other evidence, we conclude that this finding is not clearly erroneous.

Mark argues that the trial court was predisposed to granting custody to Jewel because she was the mother. He also argues that Jewel's life style did not create a healthy environment in which to raise the children. He contends that Jewel ridiculed him in front of the children and that there was evidence that Jewel physically abused one of the children.

The record indicates that the trial court was aware of the evidence relating to the above arguments and still concluded that the best interests of the children would be served by granting custody to Jewel.

The trial court stated in its findings of fact and conclusions of law that it considered the best interests of the children in deciding which parent should be granted custody. In finding of fact 23, the trial court extensively discussed the factors listed at Section 14–09–06.2, N.D.C.C.[1] The trial court said:

1. "1. The love, affection, and other emotional ties existing between the parents and child.
"2. The capacity and disposition of the parents to give the child love, affection, and guidance and to continue the education of the child.
"3. The disposition of the parents to provide the child with food, clothing, medical care, or other remedial care recognized and permitted under the laws of this state in lieu of medical care, and other material needs.
"4. The length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity.
"5. The permanence, as a family unit, of the existing or proposed custodial home.

"6. The moral fitness of the parents.
"7. The mental and physical health of the parents.
"8. The home, school, and community record of the child.
"9. The reasonable preference of the child, if the court deems the child to be of sufficient intelligence, understanding, and experience to express a preference.
"10. Any other factors considered by the court to be relevant to a particular child custody dispute." § 14–09–06.2(1–10), N.D. C.C.

"Testimony from unbiased neighbors and the evidence from the parties themselves indicate that the major burden of raising and bringing up the children up until January of 1981 rested with Jewel. There is love, affection and emotional ties between her and the two children which to this Court was built up over the years. Testimony of Jewel indicated that the children were obedient to Mark and responded to his discipline; however the showing of the affection and love was somewhat forced upon them or strained. Jewel would have better capacity and disposition to give the children and provide the children with food, clothing, medical care, and other remedial care and their material needs in that she has done such substantially by herself since the children's birth. She will be home with them in that she babysits with other children in the home. She still has the same capacity and disposition as a mother to give the children love, affection and guidance and to continue the education of the children. She has in the past been the prime mover in seeking their religious training and she has been active with the PTA and counselors in school. In the event that Mark should have custody, the children would be placed in a situation of having to get up somewhat earlier in the morning to do their chores and having to be in the school until such time Mark would come back from the office. In the event of illness, it would work a hardship to the children in having to get someone to take care of the children because Mark is at the office. During the summer months Mark intended to have his aunt Martha Peter, age 74, live in the home caring for the children while he is at the office. As admirable as her intentions are, this would not be serving the interests of the children as it would be if they were with their actual mother who they have been with since birth. Placing the children with the mother would continue the stable, satisfactory environment and desirability of maintaining continuity. Jewel having custody of the children would give permanence as a family unit of the custodial home. Both of the parents are morally fit, notwithstanding the fact that Jewel has had sexual relations with another man. Mental and physical health of Jewel is excellent in the interest of raising the children. The home, school and community record of the children would be the same regardless of which one had custody. This Court did interview the one older child, Scooter, on the records with right of cross-examination to a limited degree by both counsel. Even though the Court found that Scooter had sufficient intelligence, understanding and experience to express a preference, he refused to do so."

We have reviewed the transcript and have determined that there is a substantial evidence to support the trial court's finding. In any case, the finding as to custody does not appear to be clearly erroneous.

### Child Support

The trial court ordered Mark to pay $250 per month per child in child support. It also ordered Mark to provide the children with health insurance.

■ The objective of the trial court in setting child support payments must be to strike a balance between the needs of the children and the ability of the father to pay. *Kostelecky v. Kostelecky*, 251 N.W.2d 400, 403 (N.D.1977). Mark does not argue against the needs of the children, but only that he doesn't have the financial ability to make monthly child support payments in the amount of $500.

■ The trial court found that Mark's net income was approximately $2,000 per month. Mark contends that because he was ordered to pay the debts of the marriage, child support payments of $500 per month plus insurance is too high. The major debts of which Mark complains are $9,500 for income tax, a farm mortgage of $25,000, and a $15,000 note on an investment home. In analyzing the debts, we have concluded that the tax debt could likely have been reduced if Mark had cooperated by reimbursing Jewel $875 for the taxes which she

paid. It may still be reduced on remand if an amended tax return is determined to be possible. The other two major debts are on income-producing property which should generate enough income to repay the debts. We therefore conclude that the trial court's finding that Mark was capable of paying $500 monthly for child support was not "clearly erroneous".

■ Mark contends that the trial court's finding which says: "Defendant shall be obligated to furnish health and hospital insurance for the two minor children ...", should require him to pay to Jewel the amount of money necessary for her to purchase insurance for the children. He argues that she can purchase insurance as the custodial parent for less money than he would have to pay for the same coverage. He testified at trial that he would have to purchase a family plan in order to have the children covered. He asserts that Jewel would only need to purchase a single plus dependents policy. He testified to the following costs:

| | |
|---|---|
| Family Plan | $126.50 |
| Single Plan plus dependents | 81.00 |
| Single Plan | 54.00 |

During the hearing on Mark's motion for an amended findings of fact, conclusions of law and order for judgment, the trial court said:

"But the Court considered that testimony and the Court felt that it was his obligation to furnish insurance for those children. And how he furnishes that insurance is not this Court's decision because it would entail then a lot of work for me to have some order going through that they be paid to the Plaintiff and circumvent the bylaws or rules of Blue Cross and I didn't want to participate with that at all."

If what Mark suggests is legally and ethically possible, there is no reason the trial court should not issue an order accordingly. On remand we ask the court to so order if this method of paying for medical and hospital insurance will be less expensive.

For the reasons stated in this opinion, we affirm the judgment in part, modify it in part, and remand with instructions.

VANDE WALLE, PEDERSON and PAULSON, JJ., concur.

SAND, Justice, concurring specially.

Basically, I agree with the legal concepts employed in the opinion and its conclusions. However, I am compelled to express reservations with the commingling of tax issues, whether they be entitled benefits, breaks, exclusions, or taxability, with the equitable division of property in a divorce action.

Federal tax matters are generally not within the jurisdiction of the courts which have jurisdiction over domestic matters. The federal tax issues are invariably decided by other legal bodies, either legislative (Congress), administrative (administrative agencies), or judicial (tax courts), and in some instances in conjunction with all three. Thus, the final decision is not with the state court making the equitable distribution of the property. After a final decision has been reached on the tax matters then the court (having jurisdiction of domestic matters) would be in a better position to take into consideration such tax matters. But if these have not been resolved, the tax matters are mere possibilities and probabilities. Furthermore, what may appear to be "settled tax matters" may be changed abruptly without notice and even before the concepts relied upon in the property distribution are or can be implemented or carried out.

I believe it is much better to let the parties work out their tax problems rather than to saddle the courts with the problem of finding a solution for them. However, if the parties stipulated as to what they will consider the tax decision to be and agree to be bound by such agreement a different situation would result and the court would simply approve such stipulations as it does in any other proceedings affecting property settlement betwen the parties involved. Basically, I believe it is unfair to impose upon the court the tax problems that may arise as a result of property division. In

any event, the parties should present to the court reliable material and answers to the tax questions rather than to have the court speculate as to what the tax situation will be.