Pamela JONDAHL, Plaintiff, Appellee
and Cross-Appellant,

v.

James JONDAHL, Defendant, Appellant
and Cross-Appellee.

Civ. No. 10457.

Supreme Court of North Dakota.

Jan. 13, 1984.

Wegner, Fraase, Nordeng & Johnson, Fargo, for plaintiff, appellee, and cross-appellant; argued by Mark R. Fraase, Fargo.

Anderson Law Office, Fargo, for defendant, appellant, and cross-appellee; argued by Wayne T. Anderson, Fargo.

ERICKSTAD, Chief Justice.

Pamela Jondahl sought and was granted a divorce from James Jondahl. James, the defendant, appellant, and cross-appellee, appeals from the order entered by the District Court of Cass County on March 10, 1983, denying his motion to amend findings of fact and conclusions of law or, alternatively, for a new trial.[1] Pamela, the plaintiff, appellee, and cross-appellant, appeals from the order of the trial court dated March 11, 1983, denying her motion to amend findings of fact and conclusions of law or, alternatively, for a new trial, and also from the judgment of divorce entered by the trial court on April 12, 1983. James asserts that the trial court's property division and award of alimony to Pamela are clearly erroneous. Pamela asserts that the trial court's property division, award of alimony, award of child support, and the court's failure to award her attorney's fees are clearly erroneous.

Pamela and James were married on November 24, 1972, at Arthur, North Dakota. Both parties are college graduates. James majored in business economics at North Dakota State University and received the degree of Bachelor of Arts in 1973. Pamela has a Bachelor of Science degree in education from Mayville State College. Neither party owned property of any significant value upon entering into the marriage. On April 14, 1982, Justin, the only

---

1. An order denying a motion for amended findings of fact under Rule 52(b), N.D.R.Civ.P., is not appealable. *Applegren v. Milbank Mutual Insurance Company,* 268 N.W.2d 114, 115 (N.D. 1978). An appeal from "[a]n order which grants or refuses a new trial ...," is, however, authorized pursuant to statute. Section 28–27–02(4), N.D.C.C.

child of the marriage, was born. Pamela and James were both 31 years old at the time of the trial.

In 1976, James began driving truck for Red Owl Stores, Inc. James is also self-trained in the preparation of income, gift, and estate tax returns. In 1977, he established his own tax service in the parties' home located in Fargo, North Dakota. James is also a licensed real estate salesman and insurance agent. Prior to the commencement of this action, James performed real estate and hail insurance work with Pamela's father, Charles F. Lien, Jr.

The trial court found that, at the time of trial, James was laid off indefinitely from his job at Red Owl. James testified that, by reason of his seniority, he could still have worked at the Red Owl warehouse; however, by doing so he would have had to discontinue his tax practice because employment in the Red Owl warehouse did not involve the "flexible" hours that were involved with driving truck. The trial court also found that James was no longer associated with Lien, and no longer had the benefit of the business built up by Lien in the Arthur, North Dakota, area.

Pamela testified that she obtained employment in Fargo with Dakota Hospital in 1976, and at the time of trial was employed part time as a cashier in the business office of Dakota Hospital at an hourly wage of $6.85.

All pre-trial proceedings relating to this case were referred to a referee appointed by the trial court pursuant to its order of reference, dated June 23, 1982. The referee's findings of fact and conclusions of law, confirmed by the trial court on August 2, 1982, contained an order restraining the parties from dissipating any assets during the pendency of the divorce action. James was required to pay temporary child support of $400 per month beginning July 15, 1982; attorney's fees to Pamela of $500; the parties' monthly house payments of $355.76; and other expenses which included real estate taxes, and house, automobile, and medical insurance.

After a bifurcated four-day trial, the court granted a decree of divorce to Pamela on grounds of irreconcilable differences. In its findings of fact, the court said that "[s]ome blame for irreconcilable differences rests on both parties." The court found that the marital "rift" began after James began seeing a tax client, Lori Theurer, on a social basis. Theurer commenced working for James in his tax service in June of 1981. Although the court found that Theurer was the main cause of the parties' breakup, it also noted that the parties were experiencing marital difficulties prior to James' involvement with Theurer.

The trial court, indicating its utilization of the *Ruff-Fischer* guidelines,[2] essentially described, valued, and divided the property owned by Pamela and James as follows:

### Awarded to Pamela

| | |
|---|---|
| Refrigerator | $ 300.00 |
| Stove | 300.00 |
| Dishwasher | 400.00 |
| Garbage disposal | 50.00 |
| Garage door opener | 150.00 |
| Furniture, household goods and other appliances [for which a separate listing of the trial court's valuation thereof is not necessary for purposes of this appeal] | 6,585.00 |
| 1981 Jeep | 7,000.00 |
| Checking account | 1,160.00 |
| Savings account —First Bank of Fargo | 1,400.00 |
| Savings account —Moorhead Credit Union | 500.00 |
| All-Saver's Certificate | 9,500.00 |
| Individual Retirement Account | 2,000.00 |
| ½ of stock | 5,475.00 |
| All other items of personal property found in the marital home | (unknown value, if any) |
| NET AMOUNT RECEIVED | $ 34,820.00 |

### Awarded to James

| | |
|---|---|
| ½ of dishes, stoneware, glasses and utensils | $ 200.00 |
| Solar panels | 200.00 |
| Tools | 250.00 |
| Tool chest | 150.00 |

**2.** *See Fischer v. Fischer,* 139 N.W.2d 845, 852 (N.D.1966); *Ruff v. Ruff,* 78 N.D. 775, 52 N.W.2d 107, 111 (1952).

| | |
|---|---|
| 1978 Thunderbird automobile | $ 5,000.00 |
| 1975 Kawasaki motorcycle | 800.00 |
| Real Estate Commissions accounts receivable – Charles Lien | 4,300.00 |
| Hail Insurance Commissions accounts receivable – Charles Lien | 6,000.00 |
| Real Estate Expenses accounts receivable – Charles Lien | 1,600.00 |
| Liquid Capital Income Trust (mutual fund) | 5,100.00 |
| Savings account –Red Owl Stores, Inc. | 5.00 |
| ½ of stock | 5,475.00 |
| Individual Retirement Account | 2,000.00 |
| Checking accounts | 500.00 |

**Business Property**

| | | |
|---|---|---|
| Computer, chairs, telephone, copier, calculators, etc. | | $ 6,105.00 |
| Air conditioner | | 150.00 |
| 1964 Chevrolet pickup | | 5,000.00 |
| Loan to brother-in-law | | 200.00 |
| Check from client | | 700.00 |
| Check from Red Owl | | 26.75 |
| Water bed | | 500.00 |
| Washer and dryer | | 200.00 |
| Rent deposit | | 100.00 |
| Accounts receivable [total of $2,400.00 but only ⅓ collectible] | | 800.00 |
| | | $ 45,361.75 |
| Less mortgage of $8,500 – Red Owl Credit Union | $ 8,500 | |
| Less estimated 1982 income tax obligation | 3,000 | 11,500.00 |
| NET AMOUNT RECEIVED | | $ 33,861.75 |

The trial court valued the parties' home at $65,000, for which there existed an outstanding mortgage of $39,247.86. It awarded Pamela "rehabilitative spousal support" by imposing upon James the obligation of paying the monthly house payment of $355.76 and the real estate taxes for a period of five years. Thereafter, such obligations were ordered paid one-half by each party. Responsibility for maintenance, repairs, utilities, and insurance on the home was placed on Pamela.

The court awarded each party a one-half interest in their home as tenants in common. The court provided that Pamela was to have possession of the home until Justin reached the age of eighteen; at which time the property is to be sold and the proceeds divided equally between Pamela and James. James was ordered to pay Pamela $250 per month as child support payments until Justin reaches the age of eighteen or is otherwise emancipated.

*Property Division*

Initially, both Pamela and James assert that the trial court's findings concerning the valuation of certain items of property are clearly erroneous.

We have often said that the trial court's determination on matters of property division, alimony, and child support is to be treated as a finding of fact to be reviewed by this Court pursuant to Rule 52(a), N.D.R.Civ.P. *See VanRosendale v. VanRosendale*, 342 N.W.2d 209, 212 (N.D. 1983); *Fraase v. Fraase*, 315 N.W.2d 271, 272 (N.D.1982). A finding of fact will not be set aside on appeal unless clearly erroneous. A finding of fact is deemed clearly erroneous when we are left with a definite and firm conviction that a mistake has been made. *VanRosendale, supra; Gooselaw v. Gooselaw*, 320 N.W.2d 490, 491 (N.D. 1982).

Section 14–05–24, N.D.C.C., requires the trial court to distribute the parties' property "as may seem just and proper". The ultimate objective in dividing the marital estate in a divorce case is to make an equitable distribution, and the determination of what is equitable lies within the discretion of the trial court. *VanRosendale, supra; Fraase, supra*, 315 N.W.2d at 274. In order to make an equitable distribution, the trial court must first determine the net worth of the property owned by the parties. *Graves v. Graves*, 340 N.W.2d 903, 906 (N.D.1983). We have said that there is no requirement that the trial court place a value on the individual items making up the net worth of the parties; but when the trial court does act to set such values, as in the instant case, there should exist evidence in the record supporting the value placed upon the property. *Svetenko v. Svetenko*, 306 N.W.2d 607, 610 (N.D. 1981).

James contends the trial court's valuation of the liquid capital income trust [LCI Trust], the 1964 Chevrolet pickup, and the All-Saver's certificate given to Pamela, are all clearly erroneous and, as a result, the trial court misstated the net worth of the parties and made an inequitable distribution of property. Pamela argues the trial court's findings are clearly erroneous because no value was placed on the tax service, no value was placed on alleged accounts receivable from tax service clients for unfinished and unbilled work, and no value was placed on a $9,265 All-Saver's certificate that James redeemed prior to trial.

The parties' dispute as to the LCI Trust and the All-Saver's certificate arises from a series of transactions completed by James prior to and during the trial in this case. James testified that on or about September 13, 1982, he redeemed the All-Saver's certificate, and transferred $9,527.44 therefrom to the parties' joint checking account. James then issued checks for expenses and transferred the remainder, $6,500, to the LCI Trust. James testified at trial, in October, 1982, that the balance in the LCI Trust was $5,100. The trial was continued and on November 24, 1982, James testified that the balance in the LCI Trust was $51.

James said it was necessary for him to redeem the All-Saver's certificate in order to pay living expenses and office overhead. Included in these expenses were a payment of $200 to a clothing store on behalf of Lori Theurer, a payment of $162.66 for the repair of Theurer's pickup, a payment of $300 for an air conditioner from Theurer, a loan of $1,000 to Theurer, and wages paid to Theurer in the amount of $200. James testified the $1,000 loan was repaid by Theurer in lieu of wages and that he paid Theurer's $200 clothing bill because she had helped him in the office and helped him move. The repair of Theurer's pickup was undertaken in exchange for James' use of the pickup on a business trip to Denver, Colorado. Pamela asserts that these expenditures and all or a portion of the value of the All-Saver's certificate should have

been assessed against James in the trial court's property division.

■ We conclude the trial court's findings concerning the valuation of the LCI Trust and the All-Saver's certificate are not clearly erroneous. The trial court set forth, in the following finding of fact, the rationale for its valuation of these assets:

"Many days of the trial were spent in going through various expenditures occurring prior to the trial. It is not the duty of this Court to correct financial inequities that may have occurred during the course of the marriage. This Court can only distribute property existing at the time of the divorce. This Court can adjust unusual expenditures or transfers just prior to trial if done to give one party an advantage over the other as far as property is concerned."

It appears that the trial court concluded that a portion of James' expenditures were necessary to pay his expenses and, thus, did not include the original expended All-Saver's certificate in the marital estate. It is evident that a part of the proceeds James received from the redemption of the All-Saver's certificate was assessed against James when the trial court valued the LCI Trust at $5,100. Although James paid Theurer for services and paid some of her bills, it would appear that most expenditures prior to trial were necessary. By holding James accountable for an LCI Trust account of $5,100, the court apparently, in effect, disallowed the questionable expenses.

■ We conclude the trial court's valuation of the 1964 Chevrolet pickup at $5,000 is not clearly erroneous. The record in this case contains a depreciation schedule, prepared by James for purposes of computing depreciation expense for the parties' 1981 income tax return, which indicates the pickup was acquired by the parties in 1976 at a cost of $984. The schedule also indicates the parties expended $5,790 for "pickup improvements" from 1977 to 1980. James testified he had worked on, customized, repainted, and reupholstered the pickup. He also testified that two years prior to

trial he was offered $2,500 cash and an automobile worth $1,500 in exchange for the pickup but declined to sell. We believe there is ample evidence in the record from which the trial court could conclude that the value of the customized pickup was $5,000.

■ James asserts the trial court's finding that the value of Pamela's All-Saver's certificate was $9,500 is clearly erroneous. He contends the certificate should have been valued at its maturity value of $10,-600. The parties testified that the certificate was not to mature until four months after trial, in March, 1983. Pamela valued the certificate at $9,500. In light of the penalty that would have resulted from early redemption, James was in error. In light of the interest that had accrued, Pamela was in error. Neither apparently submitted a formula for determining a more accurate figure. In light of these circumstances and the relative insignificance of the difference in value that would have resulted from a more accounting-like determination of this item, we do not find this determination significant to the ultimate determination of the division of marital property.

■ James also asserts the trial court's categorization of the hail insurance commissions and real estate commissions as assets subject to property division are clearly erroneous, apparently because he may have difficulty collecting them from his father-in-law. They are, however, accounts receivable which the father-in-law has apparently admitted owing. Accordingly, the trial court's categorization of these accounts receivable as marital assets is not clearly erroneous.

Pamela asserts that James had performed approximately $20,000 worth of unbilled work prior to and during the time of trial which the trial court did not consider in assigning a value of $800 to the accounts receivable of the tax service. Pamela's assertion is based on James' testimony on November 24, 1982, that since October 22, 1982, he had been spending ten hours a day, five days a week, updating his files (depreciation schedules), preparing a mailing, and trying to solicit new business for his tax service.

James contends that Pamela's assertion concerning the unbilled work is unsupported by the evidence and is contradictory to James' testimony that he was spending time to update his business and bring it current so that it could become his full-time occupation. James testified that he bills his tax clients for the preparation of their tax returns and that part of the preparation is updating depreciation schedules. He also testified, however, that the work he was doing in October and November was merely "catch-up" work which he should have performed when his clients' tax returns were first completed in the spring of 1981.

■ The trial court's valuation of the accounts receivable, under the circumstances of this case, is not clearly erroneous. The trial court is "in a much better position to ascertain the true facts by listening to and observing the demeanor of the witnesses than we are by reading the cold record." *Nastrom v. Nastrom,* 284 N.W.2d 576, 580 (N.D.1979).

Pamela next asserts the trial court's failure to place a value on the tax business, excluding the tangible assets thereof, is clearly erroneous. The trial court made the following finding of fact concerning this issue:

"The issue of the valuation of the tax service, insurance and real estate is a difficult problem for this Court. This Court must resolve the problem of whether only the physical assets can be considered for distribution or whether the potential income, good will or 'blue sky' can be considered as having value. James places a zero value on it and Pamela places a $50,000.00 value on it. This Court cannot place any value on such business other than physical assets and accounts receivable in that income-producing ability of the principal in a service business may not be used in valu-

ing that business. *Gooselaw v. Gooselaw*, 320 N.W.2d 490 (N.D.1982)."

In *Nastrom v. Nastrom*, 262 N.W.2d 487, 493 (N.D.1978), we addressed the issue whether or not the entrepreneurial ability of a spouse constitutes an asset of the marriage subject to consideration as a part of the division of property. Through Justice Pederson, we said:

"In North Dakota the division of property decreed by the court is not subject to modification on grounds other than in the same manner and on the same grounds as other judgments. Where alimony or support is decreed, the court retains jurisdiction to modify its judgment upon a showing of changed circumstances.

\* \* \* \* \* \*

"... [P]otential future earnings, be they the result of a skill developed during marriage or otherwise, are much too tenuous to be a property right. It would be unjust to order the distribution of what is, at best, an expectancy, where that order would not be subject to modification should the expectancy fail to materialize. When the nature of the interest is such that the court must maintain its jurisdiction, distribution of the interest must take the form of alimony or support. Earning power (or the value of an entrepreneurial skill) is properly a consideration for the court.... Earning power is not, however, property that a court may divide as it would a parcel of land or a collection of household goods.... We do not suggest that the court ignore [the husband's] earning power, but merely limit the form that the distribution of property may take. If the trial court should, at some future time, determine that changed circumstances warrant a different amount of alimony payment, [the husband's] income, at that time, remains an appropriate subject of inquiry." [Citations omitted.] 262 N.W.2d at 492–493.

We thus concluded in *Nastrom, supra,* that the entrepreneurial skill of a spouse is not a property interest subject to a trial court's property division, but is a proper consideration in determining alimony or support. What we additionally said in *Nastrom* has special significance in this case:

"Lest we be misunderstood, nothing in this opinion should be taken as an indication that the goodwill of [a spouse's] *business interests* should not be considered in determining the value of the parties' property ...." [Emphasis in original.]

Upon review of the trial court's finding, it is evident the court treated "potential income" or entrepreneurial skill as synonomous with "goodwill" and, thus, failed to make the distinction articulated in *Nastrom* between the value of a spouse's entrepreneurial skill and the value of the goodwill of a spouse's business interests. We have said that a finding of fact is clearly erroneous if it was induced by an erroneous view of the law. *See Stee v. "L" Monte Industries, Inc.,* 247 N.W.2d 641, 644 (N.D.1976).

In *Gooselaw v. Gooselaw, supra,* 320 N.W.2d at 492, the wife argued that this Court's decision in *Fraase v. Fraase, supra,* 315 N.W.2d at 275, stood for the proposition that the income-producing ability of the principal in a service business may be used in valuing that business. We said in *Gooselaw, supra,* that this was not the holding of *Fraase:* "In *Fraase* we held that the trial court's conclusion that [the husband's] interest in the office equipment, furniture, fixtures, and accounts receivable of the law office of $35,000 accumulated over 12 years was not clearly erroneous." In *Gooselaw,* we held that the trial court's finding that a beauty school owned by the parties had a value of $50,000 was clearly erroneous. We did ascribe in *Gooselaw,* however, a valuation of $19,000 to that business based on the husband's testimony concerning the determination of the market value of beauty schools. We added to our determination of the market value of the business the value of equipment less outstanding debts to arrive at the net value of that business.

■ We do not conclude in the instant case that there exists goodwill in the parties' tax service. We do conclude that the trial court's failure to distinguish the entrepreneurial skill or potential future earnings of a spouse and the goodwill of a spouse's business interests results in a finding that is clearly erroneous. Our conclusion necessitates the remand of this case to the trial court for its reconsideration of the issue. We deem it appropriate to discuss the parties' remaining arguments because the trial court may still conclude on remand that there exists no goodwill in the tax service.

Both parties assert that certain aspects of the trial court's division of property are inequitable. James asserts that he should have been given the basement furniture for use in his tax service, and that Pamela should have been obligated to pay one-half of the parties' loan at Red Owl Credit Union as the loan was taken out to purchase the one-half of the parties' stock awarded Pamela. Pamela asserts the trial court's division of property is clearly erroneous in that (1) a "proper" application of the *Ruff-Fischer* guidelines required that the trial court award more than one-half of the marital property to her; (2) the trial court failed to award the parties' house to Pamela, the "innocent" party, pursuant to Section 14–05–25, N.D.C.C., (3) the trial court failed to consider the parties' disproportionate prepayment of attorney's fees, (4) the trial court charged Pamela for the value of the stove, refrigerator, dishwasher, garbage disposal, and garage door opener which one-half the value thereof, Pamela argues, is to be awarded to James when the house is later sold, and (5) the $3,000 tax obligation imposed upon James includes $1,200 in FICA tax which Pamela argues she is, in effect, charged with the responsibility of paying in contravention of *Fraase, supra,* 315 N.W.2d at 275–76.

■ While there are no specific rules for the distribution of property, the *Ruff-Fischer* guidelines allow the trial court to consider the respective ages of the parties to the marriage, their earning abilities, the duration of the marriage and the conduct of each during the marriage, their station in life, the circumstances and necessities of each, their health and physical condition, their financial circumstances as shown by the property owned at the time, its value and its income-producing capacity, if any, and whether it was accumulated or acquired before or after the marriage, and such other matters as may be material. *VanRosendale,* supra. The trial court need not, however, make an express finding as to each of the *Ruff-Fischer* guidelines, as the guidelines are solely an aid to the equitable division of marital property. *Nastrom, supra,* 284 N.W.2d at 581. The trial court in the instant case stated explicitly that it had followed the *Ruff-Fischer* guidelines.

Viewing the trial court's property division as a whole, we cannot conclude that it is inequitable. James earned in excess of $23,000 at Red Owl in 1981. The parties' 1981 joint income tax return indicates gross receipts of $30,314 from James' tax, real estate, and insurance businesses.[3] James testified that $17,000 of the 1981 gross receipts were from the tax service. He also testified that 1982 gross receipts from the tax service through November 22, 1982, were almost $24,000. James' decision to devote all of his time to the tax service rather than work at the Red Owl warehouse has at least temporarily diminished his earning ability; however, it appears, as the trial court noted, that the potential income-producing capability of the tax service is quite substantial.

Pamela testified she only works part time at Dakota Hospital, but works full time when other employees are on vacation. She earned approximately $9,000 in 1982, and is seeking full-time employment with the hospital. Although she has a degree in education, she is reluctant to enter the teaching profession because of the tight job market in the Fargo area and because she believes that such an employ-

---

**3.** The parties also reported $28,625 in total business deductions, which included $9,355 in depreciation expense and $4,000 in wages to Pamela, for a net profit of $1,689.

ment change would not result in any considerable economic advantage to her.

James has estimated his current monthly needs at approximately $2,100 (including the house payment of $355.76 and excluding any child support payments); Pamela has projected the monthly needs of herself and Justin at approximately $1,400 (house payment excluded).

 Upon careful review of the record and in light of the spousal support and child support awarded, we cannot conclude that the property division is inequitable. We have also reviewed the parties' arguments concerning the distribution of certain assets and obligations, and conclude that they are without merit.

### Spousal and Child Support

James asserts the trial court's award of spousal support to Pamela is clearly erroneous because the record does not indicate she is in need of rehabilitation. Recently we have treated spousal support as a method of rehabilitating the spouse disadvantaged by the divorce. *Smith v. Smith*, 326 N.W.2d 697, 700 (N.D.1982); *Briese v. Briese*, 325 N.W.2d 245, 249 (N.D.1982); *Gooselaw, supra*, 320 N.W.2d at 493; *Bingert v. Bingert*, 247 N.W.2d 464, 469 (N.D. 1976).

 James argues that Pamela has a college degree, is in good health, and is only 31 years old. The record indicates that Pamela was qualified to teach upon her graduation from college; however, she has never taught and is no longer qualified to do so. In 1973, Pamela followed James to Pennsylvania where he had obtained a sales job after graduation. The parties lived in Pennsylvania for two and one-half years. During that period Pamela obtained part-time employment as a checkout clerk at a grocery store. Upon the parties' return to North Dakota in 1975, Pamela worked a few months at a bank, was laid off, and subsequently obtained part-time employment at Dakota Hospital. She testified that to teach she would now have to "take some classes" to obtain her teaching

certificate. In light of these circumstances we cannot conclude that the trial court's award of spousal support to Pamela in the form of house and real estate tax payments is clearly erroneous from a rehabilitative objective.

Both parties contend the trial court's award of spousal support is clearly erroneous. Pamela specifically asserts that James can afford to pay at least $750 per month in spousal support. She also asserts the child support award of $250 per month is inadequate and clearly erroneous.

The *Ruff-Fischer* guidelines enumerated above are used by North Dakota courts to compel a party to provide for the maintenance of the children and allowances to the other spouse. *Smith, supra.* We have also said that the objective of the trial court in setting child support payments must be to strike a balance between the needs of the children and the ability of the father to pay. *See Fraase, supra,* 315 N.W.2d at 277.

The trial court made the following finding concerning the issues of spousal and child support:

"... During the trial James was given notice of being laid off from Red Owl. He will have very little income from insurance in that he cannot sell insurance through his father-in-law's company. His real estate income is speculative in that he now uses a new broker from West Fargo and cannot expect any assistance in selling or listing from his father-in-law. While the Defendant can now spend full time in tax work, it will not immediately replace the loss of about $23,000.00 formerly received from Red Owl. The standard of living of the two must necessarily be diminished with the loss of gross income of that substantial amount.... This Court therefore is asked to rule on matters of spousal support and child support with no assurance that the parties can make it on the amounts set by this Court. Some of the stock, IRA or cash savings might have to be used during this period of adjustment."

We conclude that in light of the uncertainty surrounding James' income, the trial court's awards of spousal support and child support are not clearly erroneous.

### Attorney's Fees

Pamela asserts that the trial court's failure to award her attorney's fees is clearly erroneous. We have said that in determining the amount of attorney's fees to be paid by the opposing party, the trial court should consider the property owned by each party as a result of the property division, the relative income, whether the property is liquid or of fixed assets, and whether or not the actions of the parties unreasonably increased the time spent on the case. *Gooselaw, supra,* 320 N.W.2d at 493–94. *Nastrom, supra,* 284 N.W.2d at 586. The trial court made the following finding concerning its decision not to award attorney's fees to either party:

> "Each of the parties has some liquid assets which can be used to pay their own attorney's fees. This Court cannot place any additional burden to pay such attorney's fees on the Defendant in that as of the time of trial, the situation was bleak financially for him due to the loss of his Red Owl job."

The awarding of attorney's fees in an action for divorce is within the discretion of the trial court pursuant to Section 14–05–23, N.D.C.C. The trial court's decision will not be disturbed on appeal unless it is affirmatively established by the party appealing that the trial court has abused its discretion. *Nastrom, supra,* 284 N.W.2d at 586; *Haberstroh v. Haberstroh,* 258 N.W.2d 669, 674 (N.D. 1977). We conclude the trial court's decision not to award Pamela her attorney's fees did not involve an abuse of discretion.

For the reasons set forth in this opinion, we remand this case solely for the trial court's consideration of the value of the tax service; however, should the trial court conclude that the valuation of the tax service and its award to James then results in an inequitable division of the property, the trial court is directed to modify the division of the marital assets accordingly. The judgment is affirmed in all other respects with costs on appeal to Pamela.

SAND, GIERKE, PEDERSON and VANDE WALLE, JJ., concur.