ReNae M. GRONNEBERG,
Plaintiff and Appellee,

v.

Bruce L. GRONNEBERG, Defendant
and Appellant.

Civ. No. 11344.

Supreme Court of North Dakota.

Aug. 12, 1987.

appellant; argued by Arthur Warren Stokes.

ERICKSTAD, Chief Justice.

Bruce L. Gronneberg appeals from the divorce judgment and decree entered by the District Court for the Northeast Judicial District on May 12, 1986, and, apparently, from the court's order denying his motion for a new trial issued on July 24, 1986. We affirm in part, reverse in part, and remand.

ReNae and Bruce Gronneberg were married at Fargo, North Dakota, on March 18, 1972. They have three children, Jason B. Gronneberg, born December 17, 1973; Jeffrey B. Gronneberg, born December 24, 1976; and Jayme B. Gronneberg, born March 8, 1980. Shortly after the marriage, Bruce and ReNae moved to Cooperstown and Bruce began farming with his father, Clarence Gronneberg. ReNae devoted her time to the care and rearing of the three children. As the marriage progressed, problems between Bruce and ReNae developed to the point where they separated in May of 1984 and on June 27, 1984, ReNae filed for divorce claiming irreconcilable differences. ReNae requested custody of their three minor children, child support, spousal support, equitable division of all property, and attorney's fees. On August 13, 1984, the court entered an order granting ReNae temporary possession of the marital home, temporary custody of the three minor children, and temporary support in the amount of $800 per month.

Trial was conducted on September 5 and 6, 1985. On October 25, 1985, the trial court issued an order directing Bruce to produce additional documentation regarding his "ownership rights and leasehold interests and obligations in farm land, farm machinery and farm products" so that the court could determine an "appropriate division of the property of the parties." The court noted that "[a] central dispute between the parties is the extent and nature of defendant's ownership rights and leasehold interests and obligations in farm land, farm machinery and farm products." It is significant to note that the court did not

Schuster, Brothers & Beauchene, Fargo, for plaintiff and appellee; argued by James R. Brothers.

Johnson, Johnson, Stokes, Sandberg & Kragness, Wahpeton, for defendant and

specifically request an accounting of the money market deposit account (hereinafter M.M.D.A.). The court ordered Bruce to "produce all abstracts of titles; and photocopies of leases, rental agreements, or other papers not yet offered in evidence indicating ownership or indebtedness and relating to farm land and equipment and farm products stored on the farm or elsewhere as of the date of trial, September 5, 1985, as between defendant [Bruce] and defendant's father [Clarence] or other leasors or title holders." Bruce, pursuant to the court's directive, provided the court with, among other items, a summarization of grain and sunflower assets in the amount of $93,428.19 and additional farm debts in the amount of $27,760.57.

On March 5, 1986, the court issued its 36–page memorandum opinion. On April 7, 1986, the court issued its memorandum opinion *nunc pro tunc* as of March 5, 1986.

On May 8, 1986, the court issued its findings of fact, conclusions of law, and order for judgment. Judgment was entered on May 12, 1986.

On June 13, 1986, Bruce filed a motion for a new trial premised on ten specifications of error.[1] The court convened a hearing on the motion for a new trial on July 15, 1986, and issued its findings and order denying Bruce's motion for a new trial on July 24, 1986.

Bruce asserts that the trial court erred in: (1) calculating the net worth of the parties, (2) failing to consider the tax consequences of distributing Bruce's Keogh retirement account to ReNae in making its marital property division, (3) failing to consider the payments of temporary support of $800.00 per month pursuant to the court's order entered on August 13, 1984, in determining the division of marital property, (4) awarding ReNae one-half of Bruce's pre-marital assets, (5) disallowing the lease debt between Bruce and his father, (6) placing custody of the minor children with ReNae, (7) determining the amount of child support to be paid by Bruce, and (8) charging the total costs of the guardian and social services to Bruce.

Bruce initially argues that the trial court erred in calculating the net worth of the parties and as a result made an inequitable division of marital property. He most strongly contests the trial court's inclusion of the M.M.D.A. account of $64,592.00, as of May 26, 1984, in calculating the parties' assets of $446,983.44, as of September 5, 1985. He asserts that the M.M.D.A. account was used primarily for farm operating expenses for the two growing seasons between May 26, 1984, the date of separation, and August 5, 1985, the date he prepared his appraisal of the parties' net worth. He asserts that the depletion of $64,592.00 in the M.M.D.A. account corresponds to the increase of $71,792.06 in the value of grain, as of August 5, 1985. Simply stated he asserts that the M.M.D.A. dollars were converted into bushels of stored grain. He contends that the depletion of the M.M.D.A. account was not focused on at the time of trial and that the trial court, without notice to him, focused

1. The ten specifications of error were presented as follows:

"1. The net worth of the parties as found by the court is erroneous and confusing and does not conform to the evidence.

"2. Many facts as found by the court are error and either not adduced from the evidence or unproven.

"3. The court failed to consider the tax consequences in making its proposed division of the property of the parties.

"4. The court erred in distributing one half of the Defendants premarital assets to the Plaintiff.

"5. The court erred in refusing to listen to the wishes of the children in making its custody determination.

"6. The court erred or did not consider the Defendant's ability to pay child support in issuing its decision.

"7. The court erred in disallowing the admitted debt of the Defendant to his father which was corroborated by the father.

"8. The Defendant has discovered an IRA and Certificate of Deposit held by the Plaintiff that wasn't included in the proposed division of property.

"9. If it was the court's intention to divide all of the parties' assets as of September 5, 1985, the court erred in failing to take into consideration rents received by the Plaintiff from her trust account.

"10. The court erred in distributing earnings of the defendant in addition to the addition in net worth."

on the M.M.D.A. account after trial. He asserts had he known that the trial court was going to question the depletion of the M.M.D.A. account that he could have accounted for the depletion as corresponding to farm operating expenses incurred between the separation and the trial which he claims he did through his testimony at the trial and thereafter in conjunction with his motion for a new trial through the production of numerous photocopies of checks and bank statements.

ReNae responds that the trial court correctly factored in the M.M.D.A. account to arrive at the parties' net worth, claiming that it was a credibility issue whether or not the depletion of the M.M.D.A. account was used for farm operating expenses and other properly deductible expenses. She argues that Bruce's failure to explain the depletion of the M.M.D.A. account pursu-

ant to the court's directive, issued on October 25, 1985, justifies the court's action. In support of her contention, ReNae notes that Bruce borrowed $58,990.00 during that interim for farm operating expenses and therefore should not have had to deplete the M.M.D.A. account.

Our resolution of this issue begins with the testimony and evidence presented at trial and with the trial court's calculation of the parties' net worth as demonstrated in the court's memorandum opinion *nunc pro tunc* issued April 7, 1986, as of March 5, 1986.

At the trial commencing on September 5, 1985, the court received in evidence defendant's exhibit G over objection of the plaintiff which purported to state the net worth of the parties as of May 5, 1984. Exhibit G follows:

"ASSETS

| | | | |
|---|---|---|---|
| CD's | $14,125.60 | | |
| Checking | 8,815.30 | | |
| Stocks | 7,994.55 | | |
| Keogh | 51,455.97 | | |
| Equipment | 60,360.00 | | |
| Datsun Pickup | 3,000.00 | | |
| Grain 9087 | 31,804.50 | | |
| House | 67,000.00 | | |
| 1984 Cutlass Olds | 10,700.00 | | |
| Household Furnishings | 8,000.00 | | |
| M.M.D.A. Account | 64,592.00 | **TOTAL ASSETS** | $327,847.92 |

LIABILITIES

| | |
|---|---|
| Accrued Lease | $140,875.20 |
| 1984 Tax Liab. Fed. | 28,919.00 |
| 1984 Tax Liab. State | 2,609.00 |
| | $172,403.20 |

NET WORTH ---------- 5–26–84 $155,444.72 ---------- $155,444.72"

The court earlier in the trial had received in evidence, at ReNae's urging, plaintiff's exhibit 3, which showed the alleged assets as of May 5, 1984, including the M.M.D.A. account, but did not contain the list of alleged liabilities. Exhibit 3 follows:

**"FINANCIAL STATEMENT**
**ASSETS AND LIAB.**
**5-26-84**

ASSETS

| | |
|---|---|
| CD'S | $14,125.60 |
| Checking | 8,815.30 |
| Stocks | 7,994.55 |
| Keogh | 51,455.97 |
| Equipment | 60,360.00 |
| Datsun Pickup | 3,000.00 |
| Grain 9087 | 31,804.50 |
| House | 67,000.00 |
| 1984 Cutlass Olds | 10,700.00 |
| Household Furnishings | 8,000.00 |
| M.M.D.A. Account | 64,592.00 |

**\*\*TOTAL ASSETS\*\*** .................. $327,847.92"

Still earlier in the trial the court received in evidence defendant's exhibit B which purported to state the assets and liabilities of the parties as of August 5, 1985, shortly before trial. The court received exhibit B with the stipulation that everything was agreed to except the item entitled "Accrued Lease $140,875.20" and except for the net worth.[2] The total assets figure of $327,-847.92 was stipulated to as correct. Exhibit B follows:

**"FINANCIAL STATEMENT**
**ASSETS AND LIAB.**
**8-5-85**

ASSETS

| | | |
|---|---|---|
| CD's | $14,125.60 | |
| Checking | 1,830.28 | |
| Stocks | 7,994.55 | |
| Keogh | 65,455.97 | |
| Equipment | 60,360.00 | |
| Datsun Pickup | 3,000.00 | |
| Grain | 103,596.56 | Grain is taxable |

2. "Q. Okay. Real fine. I'm going to show you what has been marked as Defendant's Exhibit B, which is a financial statement of assets and liabilities as of August 5, 1985, and ask you if you recognize that.

"A. I do.

"Q. Is this an exhibit as prepared by yourself?

"A. Yes.

"MR. STOKES: Okay. I would then offer Defendant's Exhibit B with the stipulation from Mr. Brothers that we have agreed as to the total value of the assets, of which have been initialed by both Mr. Brothers and myself, and we have agreed to the liabilities to the extent of the note and the interest on the note in the amount of $58,990.54. That the lease payments which are indicated on this exhibit have not been stipulated to and we are at this time prepared to offer testimony in regard to that.

"MR. BROTHERS: With that understanding, there's no objection, Your Honor.

"THE COURT: Exhibit B will be received. Now, you made a reference to lease payments. As I understand from side bar conversation between counsel that the item that is in dispute is the item that is shown under the caption 'Accrued Lease.' Is that what you're referring to?

"MR. STOKES: That is correct, Your Honor.

"THE COURT: Everything else is agreed to?

"MR. BROTHERS: That's right, Your Honor.

"THE COURT: And so the net worth of the parties is not agreed to, either, then.

"MR. BROTHERS: That's correct.

"MR. STOKES: That is correct.

"THE COURT: With that reservation the exhibit will be received."

ASSETS

| | | |
|---|---|---|
| House | 67,000.00 | |
| 1984 Cutlass Ciero | 8,350.00 | |
| 1984 Cutlass Ciero | 8,350.00 | |
| Household Furnishings | 8,000.00 | TOTAL ASSETS*** $348,062.96 /s/ JRB /s/ AWS |

LIABILITIES

| | | |
|---|---|---|
| Accrued Lease | $140,875.20 | |
| Notes and Interest on Notes | 58,990.54 | /s/ AWS TOTAL LIAB.*** $199,865.74 |
| | | /s/ JRB |

NET WORTH OF THE PARTIES INCLUDING GIFTS: $148,197.22"

Counsel for each of the parties had initialed the figure of $58,990.54 for notes and interest on notes as being correct, and the total assets figure as being correct as of August 5, 1985, subject to the dispute over the validity of the alleged accrued rental on the alleged oral lease.[3]

During the trial, which focused mainly on the facts surrounding the issue of custody and facts involving the alleged oral lease, counsel for ReNae questioned Bruce, notwithstanding the stipulation referred to herein, concerning the disappearance of the M.M.D.A. account from the August 5, 1985, financial statement (defendant's exhibit B).

3. Bruce and his father testified that Bruce owed this amount of money as rent for farm machinery of the market value of $150,000 to $200,000, rent of eight grain bins, and rent of three machine sheds, pursuant to an oral lease, with payments to commence when Bruce's father reached 72 years of age.

4. At trial, Bruce was cross-examined concerning the depletion of the M.M.D.A. account and the use of the money represented by the notes and interest on the notes. The questions and answers follow:
"Q. The second big difference between the two statements is something called an M.M.D.A. Account, which on May 26, 1984, showed $64,592.
"A. Yes.
"Q. I don't see that any place.
"A. That has been relinquished or has been spent.
"Q. You spent $64,592?
"A. Mm-hmm.
"Q. On what?
"A. Well, income tax was just about $30,-000. And—
"Q. For which year?
"A. Hm?
"Q. For what year?
"A. '84.
"Q. That you paid in '85?
"A. Yeah. Yeah. It was payable in '85. And cash rent for '84 crop is paid at the beginning of 1985 and that was 15,600.

Bruce responded by testifying that the M.M.D.A. account was used in paying about $30,000 in income tax, $800 per month in family support (apparently August 1984 through September 1985 for 14 months or $11,200), $15,600 for cash rent for 1984 crop at beginning of 1985, and $400 per month for his apartment rent for 11 months, or $4,400 (as ReNae was living in their home). This totals $61,200.

Bruce further testified that he spent the money represented by the note for $58,-990.54 for farming expenses for the 1984 crop and for the 1985 crop still to be harvested as of August 5, 1985.[4]

"Q. Okay.
"THE COURT: This is cash rent paid now for the four quarters that you rent from somebody other than your father.
"THE WITNESS: Right. And I'll make out $800 a month to my family. That has been coming out of this, you know.
"Q. (Mr. Brothers continuing) Mm-hmm.
"A. And I was living in an apartment and it was costing me about 400 up to this last month. So it adds up.
"Q. So you had no income, then, from last year?
"A. What do you mean, no income?
"Q. Did you have any income from last year to pay some of these expenses that you're talking about?
"A. I had to get a note.
"Q. Yeah, I understand that you borrowed $58,000, if I understand it right, to pay these expenses, and you're saying you spent $64,000 on top of borrowing the 58,000.
"A. Yes.
"Q. So you spent a hundred—that's about $120,000.
"A. It costs money to farm.
"Q. Yeah. It costs 15,000 to cash rent.
"A. Yes.
"Q. What'd you spend the other hundred thousand dollars on?
"A. Expenses; it just went out.
"Q. Just kind of goes, $100,000 just kind of goes.

After the court sought additional information, but not specifically concerning the M.M.D.A. account, and additional information was submitted by Bruce, the court issued its memorandum opinion *nunc pro tunc*, as earlier referred to herein, which recognized additional farming expenses for the 1985 crop of $27,760.57, and values of $39,249.49 for the 1984 crop and $54,178.70 for the 1985 crop.

■ For the purposes of this issue, the critical feature of the court's finding is that the court included in its determination of net worth $69,550.58 for the M.M.D.A. account which the court in its memorandum opinion said was "unexplainably missing." The court arrived at that figure by taking the account as of May 5, 1984, at $64,-592.00 and adding six percent interest.

The court, in effect, not only included that amount in determining net worth, but it awarded that theoretical account for that amount to Bruce as part of his share of the marital estate in its findings of fact, conclusions of law, and order for judgment dated May 8, 1986.

When this was done, Bruce apparently made a motion "to amend findings or for a new trial."[5]

Under the peculiar procedure that Bruce followed, counsel merely attached photocopies of the M.M.D.A. account to his brief in support of his contention that the court erred in determining the net worth of the parties by including the accrued value of the non-existent M.M.D.A. account in that determination. The drafts and the statements were not offered in evidence, nor was any attempt made by Bruce to show how each draft supported his contention that the account was spent for proper purposes in conjunction with the farming operation.

In fact, to this day, no attempt has been made by Bruce to go through the drafts and prove their relevance. Incidentally, we have examined the drafts and find many of them not only illegible, but unintelligible, without explanation.

Neither the trial court nor this Court are required to undertake the responsibility of proving their relevance.

Notwithstanding that fact, we believe that the court was under a misapprehension of the facts when it informed counsel for Bruce at the hearing on the motion that the M.M.D.A. account "was not testified to" at the trial, and that it was "not bound to accept this latter day evidence that was not presented at trial."

It is true that the documents of the M.M.D.A. accounts were not offered and explained at the trial, but it is not correct to say that there was no testimony as to the M.M.D.A. account at the trial. See earlier summary in this opinion and footnote 4 for evidence of testimony to the contrary.

It is understandable, in light of the protracted life of this case, that the court might have become impatient with counsel for Bruce, but it is troubling that when counsel attempted to speak further on this issue at the hearing, possibly to explain that there was testimony offered at the trial on this issue, and possibly to attempt

"A. I can prove it with my records.
"Q. Don't you know?
"A. I'd have to lay it out. I've got my canceled checks to prove it out. From May 26th of '84 I had spent, I checked that out one time on May 26, '82 to January 1 of '85 I had spent seventy-five some thousand dollars.
"Q. And had no income during that period?
"A. What do you mean, no income?
"Q. Just what I said.
"A. No, I wasn't spending the M.M.D.A. Account and what was in checking.
"THE COURT: Excuse me. Clarification. What is an M.M.D.A.?
"THE WITNESS: A market type of checking account.

"THE COURT: So they pay interest on the checking account?
"MR. STOKES: Maybe, Mr. Brothers, you know the M.M.D.A. Account is now $64,000, but the grain has gone up to 103, where it was about $30,000.
"MR. BROTHERS: I understand that he banked the '84 crop.
"THE WITNESS: The bank in the bin.
"MR. STOKES: Is that right? Okay."

5. The judgment roll does not include the motion, thus the language of the motion is taken from the "brief in support of motion to amend findings or for a new trial." The notice of hearing refers to the motion as a "motion to amend judgment or for a new trial."

to itemize that testimony, although counsel had not secured and submitted to court an extract of that testimony, the court cut counsel off with the words, "I think argument is closed." Had counsel been able to explain what counsel was relying on at the trial, the court might have weighed the testimony and found it wanting, especially in light of the lack of specific evidence relative to the expenditure of the money represented by the $58,990.54 figure for notes and interest on notes. But on this record it appears that no weighing was involved in deciding this issue, and therefore no discretion was exercised by the court. The trial court's failure to exercise discretion on this issue was an abuse of discretion.

■ To avoid possible prejudice resulting from this error, we believe it best to remand this case to the trial court for a new trial on the issues of the determination of the net worth, an accounting of the M.M. D.A. account, an accounting of the money borrowed as represented by the notes and interest on notes, and for a redistribution of the assets of the marital estate if the findings on these issues so warrant. We believe Rule 59(b)(1) [6] is the proper authority for directing a new trial on these issues. *See e.g., Demaray v. Ridl,* 249 N.W.2d 219, 225 (N.D.1976) (trial court may grant new trial pursuant to Rule 59(b)(1), N.D.R. Civ.P., when bailiff did not inform the trial court that the jury had questions regarding jury instructions); *Lange v. Cusey,* 379 N.W.2d 775, 777 (N.D.1985) (trial court properly granted new trial pursuant to Rule 59(b)(1) when counsel discussed incompetent evidence with jury). *Cf. Gorder v. Sims,* 306 Minn. 275, 237 N.W.2d 67, 72 (1975) (Minnesota appellate courts' authority to grant new trial pursuant to Minnesota Rules of Civil Appellate Procedure is broader than trial court's authority under Rule 59.01 of the Minnesota Rules of Civil

Procedure, which is similar to our Rule 59(b)(1)). Rule 59(a)(2) of the Federal Rules of Civil Procedure provides the basis for new trials in the Federal system; it reads:

"*(a) Grounds.* A new trial may be granted to all or any of the parties and on all or part of the issues ... (2) in an action tried without a jury, for any of the reasons for which rehearings have heretofore been granted in suits in equity in the courts of the United States. On a motion for a new trial in an action tried without a jury, the court may open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions, and direct the entry of a new judgment."

*See generally DuPont v. United States,* 385 F.2d 780, 783–84 (3d Cir.1967); 6A J. Moore, *Moore's Federal Practice* ¶ 59.07 (2d ed. 1986). *See also* Rule 59(h), N.D.R. Civ.P.

■ Bruce argues as his second point concerning the property distribution that the trial court failed to consider the severe adverse tax consequences he would suffer resulting from the assignment of his Keogh retirement account to ReNae. Bruce asserts that he would have to pay an estimated recapture tax of approximately $39,669.00 because of this transfer. This issue has not been adequately briefed by either party nor has Bruce submitted evidence supporting his contention that the transfer will cost him $39,669.00 in taxes. Bruce merely attached a statement to his trial court brief, allegedly signed by one Chas F. Lein, Jr. The statement predicted a "[t]otal tax liability because of early withdrawal of the KEOGH RETIREMENT PLAN $39,669.00." We are unable to resolve this issue without speculation on this record. In *Briese v. Briese,* 325 N.W.2d 245, 248 (N.D.1982), we said that "[t]his

6. Rule 59(b)(1), N.D.R.Civ.P., reads:
"*(b) Causes for New Trial.* The former verdict or other decision may be vacated and a new trial granted on the application of a party aggrieved for any of the following causes materially affecting the substantial rights of the party:

"1. Irregularity in the proceedings of the court, jury, or adverse party, or any order of the court or abuse of discretion by which either party was prevented from having a fair trial."

court will not speculate as to the possible outcome of a federal tax matter over which we have no jurisdiction." *See also Fraase v. Fraase*, 315 N.W.2d 271, 278 (N.D.1982) (Sand, J., special concurrence). A solution was found to a similar situation in a more recent opinion, *Bagan v. Bagan*, 382 N.W.2d 645, 648–49 n. 6 (N.D.1986), where Justice Levine, speaking for the Court, said:

> "There is insufficient evidence in the record on this matter. Therefore, on remand, we direct the parties to provide evidence upon which the trial court may determine the tax consequences and consider them in its decision on spousal support and child support."

As a remand is necessary to determine the first issue in this case and to insure that funds are not unnecessarily lost in the marital estate, we direct the trial court on remand to receive evidence and permit legal argument on this issue. If the trial court concludes that an adverse tax consequence would result, which could be avoided by a different allocation of property, which would be equitable, we direct the court to amend its property distribution accordingly.

■ Bruce argues as his third point concerning the property distribution that the trial court erred by failing to consider his temporary support payments of $800.00 per month paid pursuant to the court's order of August 1984. Because Bruce apparently made these payments from funds taken from the M.M.D.A. account or from the money borrowed and as this case is remanded for a redetermination of net worth and an accounting of those accounts, we believe that this issue can best be resolved when that is done. We accordingly so direct.

■ Bruce argues as his fourth point concerning the property distribution that the trial court erred in awarding ReNae one-half of his premarital assets. Bruce asserts that he brought into the marriage such a disproportionate share of assets that it was unjust for the trial court not to have distributed to him a greater share of the premarital property.

While we have recognized as consistent with the *Ruff-Fischer* guidelines, *Fischer v. Fischer*, 139 N.W.2d 845 (N.D.1966) and *Ruff v. Ruff*, 78 N.D. 775, 52 N.W.2d 107 (1952), that the time of the acquisition of property and its source is significant, we have nonetheless concluded that property acquired prior to the marriage by one spouse should be considered as part of the marital estate in determining an equitable division.[7] *Fraase v. Fraase*, 315 N.W.2d 271, 274 (N.D.1982); *Fine v. Fine*, 248 N.W.2d 838, 841 (N.D.1976); *Hultberg v. Hultberg*, 259 N.W.2d 41, 44 (N.D.1977). In *Fraase*, 315 N.W.2d at 274, we said:

> "The fact that property subject to distribution was acquired by one of the parties prior to the marriage is a consideration weighing in favor of that party, but it does not prevent the court from awarding part or all of the property to the other party should an equitable distribution require it."

■ The trial court considered the value of property brought into the marriage by Bruce and by ReNae, and although the value of the property contributed to the marriage by Bruce ($80,080.30 according to his estimate) was considerably greater than the value of the property contributed to the marriage by ReNae ($12,000.00), the court concluded that an equal division of premarital assets was warranted in that:

---

7. The *Ruff-Fischer* guidelines are as follows:
 "In determining the question of alimony or division of property as between the parties, the court, in exercising its sound discretion, will consider the respective ages of the parties to the marriage; their earning ability; the duration of and the conduct of each during the marriage; their station in life; the circumstances and necessities of each; their health and physical condition; their financial circumstances as shown by the property owned at the time, its value at that time, its income-producing capacity, if any, and whether accumulated or acquired before or after the marriage; and from all such elements the court should determine the rights of the parties and all other matters pertaining to the case." *Fischer v. Fischer*, 139 N.W.2d 845, 852 (N.D. 1966).

"Both parties have made substantial though different contributions to this marriage. Bruce should be awarded sufficient property to provide ongoing support for his children, to provide future spousal support for his wife as may be required; and to maintain his partnership farming interests with his father and mother. ReNae as wife and mother for twelve years and more should be awarded sufficient property and money, consistent with the demonstrated means and needs of the parties as parents of three growing sons, so that she too may proceed to the next stages of her life with the same degree of financial confidence that Bruce has also earned."

After reviewing the evidence and testimony presented, we do not conclude that the court's finding as to an equal distribution of premarital assets to be clearly erroneous.

■ Bruce argues as his fifth point concerning the property distribution that the trial court erred in disallowing an oral lease debt between him and his father, Clarence. The trial court, in disallowing the $140,000 oral lease debt, said:

"The Court in consideration of all of the other testimony in the case and all the other evidence in the case with respect to their financial arrangements and the records that have been kept and shown to the Court from other operations, other aspects of their operations, was that the contention that there was this obligation was not to be believed. I did not believe it and it's a matter of credibility evidence and the Court has a right to pass on that and a duty.

"And one of the reasons that the Court doesn't believe it is that the terms are in themselves so grossly unfair as to being credible of their own terms and unfair to Mr. Bruce Gronneberg.

"And a third reason why they were not believed is that there was no record or mention of such an arrangement until the divorce came into play.

"And there's also a fourth reason and that was that there was no genuine obligation to repay the 5,000 a year if Bruce could afford it. He would have to live another 70 years to carry out the obligation to pay it without any interest.

"All of those points lead to the irrefutable conclusion that the representation was a sham. And I so held and I so hold."

We agree with the trial court that the existence of the $140,000 oral lease was an issue of credibility. Clarence testified, under cross-examination, that the first attempt to formalize the lease arrangement arose after divorce proceedings had been initiated. The questions and answers as to that testimony follow:

"Q. It wasn't until the divorce came along, was it, that anybody sat down with Billy Rice to try and figure out values to be ascribed to the use of machinery or the use of grain bins.

"A. No.

"Q. So there's no misunderstanding, he was consulted after the divorce started, was he not?

"A. Yeah, I told Bruce to take them down there and see if he was getting a fair deal.

"Q. And this whole lease business was all put together after the divorce started.

"A. What part?

"Q. Well, I don't know, the lease of the farm machinery and the use of the grain bins and the use of some trucks and—

"A. Yup.

* * * * * *

"Q. The first attempt by either you or by Bruce to, well, let's say formalize this lease arrangement that you've been talking about here in terms of amounts and that sort of thing, the first attempt to do that came after the divorce started; is that right?

"A. Yes.

"Q. And you, who maintains one of the most meticulous sets of farm records that the IRS has ever seen, have no written memorandum concerning this agreement except that which has been

prepared since the divorce started; is that right?

"A. Everything has been oral."

It is well settled that credibility of witnesses and the weight to be given their testimony are exclusively functions of the trial court. *Schmidt v. Schmidt,* 325 N.W.2d 230, 233 (N.D.1982); *Peterson v. Hart,* 278 N.W.2d 133, 136 (N.D.1979). After reviewing the record, we are not left with a conviction that a mistake has been made in the trial court's finding in essence that the obligation to pay rent for machinery and buildings purportedly evidenced by an oral lease did not exist. The trial court's findings on this issue are therefore not clearly erroneous and thus are sustained.

Bruce next argues that the trial court erred in awarding ReNae custody of the three children. The court found that the best interests of the three children would be served by placing them in the custody of ReNae with liberal visitation rights in Bruce. The parties submitted extensive testimony and evidence, including reports from the *guardian ad litem* and Griggs County Social Services, relating to the issue of custody. The trial court devoted ten pages in its memorandum decision *nunc pro tunc* to this issue. The court concluded that the evidence reveals that Bruce devoted much of his time attending to the needs of the farming operation; that ReNae devoted her time to the care and rearing of the three children; that Bruce was more preoccupied with the farming opera-

tion than the needs of the children; that much of the daily care for the children would be accomplished by Bruce's mother if Bruce were to be awarded custody; that ReNae had the greater and more consistent capacity and disposition to provide the love, affection and guidance the children needed in their preparation for life; that if Bruce were awarded custody the children would be more than likely to lose the meaningful relationship they had established with their mother; and, that ReNae would be better able and willing to provide care and opportunities for self-development for each of the children.

■ We find no merit in Bruce's argument that the trial court erred in failing to consider the reasonable preferences of the children in making its custody decision. The record discloses that Bruce did not attempt to call the children as witnesses. Additionally, the trial court was aware of the children's alleged preference for Bruce from the report submitted by the *guardian ad litem,* and fully considered their preference as a factor in determining custody. The court found after considering all the factors in Section 14–09–06.2, N.D.C.C.,[8] including the careful observations of a representative of social services, that the best interests of the children would be served by placing custody in ReNae.

We have reviewed the record and have determined that the trial court's findings as to custody are not clearly erroneous.

---

**8.** Section 14–09–06.2, N.D.C.C., reads, in part, as follows:

"*Best interests and welfare of child—Court consideration—Factors.* For the purpose of custody, the best interests and welfare of the child shall be determined by the court's consideration and evaluation of all factors affecting the best interests and welfare of the child. These factors include all of the following when applicable:

"1. The love, affection, and other emotional ties existing between the parents and child.

"2. The capacity and disposition of the parents to give the child love, affection, and guidance and to continue the education of the child.

"3. The disposition of the parents to provide the child with food, clothing, medical care, or other remedial care recognized and permitted under the laws of this state in lieu of medical care, and other material needs.

"4. The length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity.

"5. The permanence, as a family unit, of the existing or proposed custodial home.

"6. The moral fitness of the parents.

"7. The mental and physical health of the parents.

"8. The home, school, and community record of the child.

"9. The reasonable preference of the child, if the court deems the child to be of sufficient intelligence, understanding, and experience to express a preference.

"10. Any other factors considered by the court to be relevant to a particular child custody dispute."

Bruce next argues that the trial court erred in ordering him to pay $250 per month per child in child support.

 The objective of the trial court in setting child support payments must be to strike a balance between the needs of the children and the ability of the father to pay. *Fraase*, 315 N.W.2d at 277; *Kostelecky v. Kostelecky*, 251 N.W.2d 400, 403 (N.D.1977). Bruce does not argue against the needs of the children, but only asserts that the trial court did not consider his ability to pay child support in issuing its decision. The trial court explained its decision in part as follows:

"I believe it is an insult to the intelligence of the parties to say that the defendant [Bruce] is unable to pay $250 a month child support when he has $103,-000 worth of grain in the elevator, and that's only one item. And this Court sits on cases involving people of all walks of life and all sorts of resources and lack of resources. Child support starts at $100 a month on almost a floor for anybody that's got a working wage and no property. And for Mr. Gronneberg to have his attorney represent to the Court that he is devoid of ability to pay that amount in child support exceeds my credulity. I cannot believe that that should be a point that should be contended; and on the other hand, for Mr. Gronneberg to contend that $250 is all it costs to raise a child strains my credulity on the other side.

"And there also has to be taken into account this little used or little relied upon doctrine, but I think there's some validity to it. There is no reason why these children should be put into a state of poverty of the size of the sort conceived by Mr. Gronneberg in the event that the custody were to be awarded to the plaintiff [ReNae].

\* \* \* \* \* \*

"[T]he children should be given an opportunity to grow up and become members of the community for which they were born into and they should not be rendered poverty stricken in the meantime. And the gist, as I understand it, or con-

tentions of the defendant, if I can't have the children and not have to pay child support at all, I don't want to pay the kind of child support that a person of my means should pay if I don't have them. And so the principle that I am talking about is that a child should be considered to have a right to be maintained in a custodial basis after a divorce in a manner similar to that which they had a right to become accustomed to, taking into account the financial resources of the parents."

While it is true that Bruce's 1985 crop and income projection (defendant's exhibit E) shows a projected loss from farming of $13,342.63, we believe that his depreciation schedule of $25,413 should be set apart when one considers his ability to pay child support as that schedule does not detract from his ability to pay support. This result leaves Bruce with a projected disposable income of $12,070.37. However, when Bruce's actual 1985 crop income of $54,-178.70, as listed in his "summarization of assets and debts" on November 20, 1985, is substituted for his projected 1985 crop income of $41,814, his disposable income for that year rises to $24,435.07. Additionally, when we consider the parties' total assets of $348,062.96 as of August 5, 1985, a large amount of which was contributed by Bruce's hard work, we find his contention that he is not capable of paying $750 monthly for child support to be without merit. We note that Bruce, in his answer, "admitt[ed] that he is presently capable of earning sufficient sums to support himself and his children as a farmer and states that his income varies from year to year depending on farm production and farm prices." We therefore conclude that the trial court's findings relative to child support are not clearly erroneous.

 Bruce argues lastly that the trial court erred in charging the costs of the guardian and social services to him. He contends that these costs should have been paid out of the marital estate prior to an equitable division. The taxing of costs is discretionary with the trial court in a di-

vorce case. *Klitzke v. Klitzke*, 308 N.W.2d 385, 390 (N.D.1981). While the trial court is required to make an equitable division of marital property, the court is not obligated to tax costs prior to its distribution. We conclude, after examining the record, that the trial court did not abuse its discretion in ordering Bruce to pay the costs of the guardian and social services.

For the reasons stated herein, we affirm the judgment in part, reverse in part, and remand for further proceedings consistent with this opinion.

VANDE WALLE, GIERKE and MESCHKE, JJ., concur.

LEVINE, J., concurs in the result.